## STATE OF CONNECTICUT *v.* SANTOS MIRANDA
### (SC 17088)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued March 24, 2004—officially released August 2, 2005

*Daniel J. Krisch*, with whom were *Michael S. Taylor* and, on the brief, *Kenneth J. Bartschi* and *Julia K. Ulrich*, legal intern, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

PER CURIAM. This case is before us for a third time. See *State* v. *Miranda*, 260 Conn. 93, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002) (*Miranda II*); *State* v. *Miranda*, 245 Conn. 209, 715 A.2d 680 (1998) (*Miranda I*).[1] The defendant, Santos Miranda, appeals from the trial court's judgment, rendered after remand from the Appellate Court, resentencing him to a total of thirty years imprisonment for his conviction of assault in the first degree in violation of General Statutes § 53a-59 (a) (3)[2] and risk of injury

---

[1] We issued a brief per curiam opinion in the present case as a slip opinion on December 22, 2004, reversing our conclusion in *Miranda I* that the defendant could be convicted of assault in the first degree in violation of § 53a-59 (a) (3) and, accordingly, remanding the case to the trial court with instruction to dismiss the two assault counts in the information. *State* v. *Miranda*, 272 Conn. 430, 431, 864 A.2d 1 (2004) (en banc per curiam with one justice dissenting). We further ordered that the defendant be released on a written promise to appear as an appeal bond on the only remaining count of the information for risk of injury to a child; id., 432; and stated that a full opinion would follow in due course. We now issue this more substantive opinion together with the concurring and dissenting opinions issued simultaneously herewith.

[2] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

We recognize that § 53a-59 has been amended several times since the time of the defendant's offenses, however, subsection (a) (3) has remained unchanged. References herein are to the current revision of the statute.

to a child in violation of General Statutes (Rev. to 1991) § 53-21. On appeal to this court, the defendant claims that: (1) the judge trial referee who presided over his resentencing hearing lacked the statutory authority to do so; and (2) the judge trial referee abused his discretion by sentencing the defendant to thirty years imprisonment in light of the more lenient sentence imposed on his girlfriend, the victim's mother, in her separate criminal trial. In addition, in a supplemental brief requested by this court, the defendant contends that we should reconsider and reverse our conclusion in *Miranda I* that the defendant could be convicted of assault in the first degree in violation of § 53a-59 (a) (3) for failing to protect the victim from physical abuse by her mother.

We reject the defendant's claim that the judge trial referee who resentenced him lacked the statutory authority to do so. We agree with the defendant, however, that we should reconsider and reverse our conclusion in *Miranda I*. We therefore reverse the defendant's conviction of two counts of assault in the first degree in violation of § 53a-59 (a) (3) and remand the case to the trial court, first, to dismiss the charges in those counts of the information and, second, for resentencing on the only remaining count on which the defendant stands convicted, risk of injury to a child, in accordance with *Miranda II*.[3]

---

[3] In his initial brief filed in connection with this appeal, the defendant claimed that the trial court abused its discretion in resentencing the defendant by failing to consider adequately the sentence received by the victim's mother. Specifically, the defendant claims that the court abused its discretion by resentencing him to thirty years incarceration, while the victim's mother, who purportedly was the person who actually abused the victim, received a more lenient sentence. Subsequent to the defendant's initial sentencing, the victim's mother pleaded nolo contendre to charges of intentional assault in the first degree and risk of injury to a child. *Miranda II*, supra, 260 Conn. 99 n.4, citing *Miranda I*, supra, 245 Conn. 211–12 n.4. She received a sentence of twelve years incarceration suspended after seven years. In light of our conclusion that the defendant's conviction for assault in the first degree in violation of § 53a-59 (a) (3) must be reversed and the charges dismissed,

The familiar facts and procedural history of this case are set forth in our decision in *Miranda II*, supra, 260 Conn. 93, and will not be repeated here. After our decision in *Miranda II*, the case was remanded to the trial court for resentencing. By this time, Judge Fracasse, who had presided over the defendant's initial trial nine years earlier, had reached the mandatory retirement age of seventy prescribed by article fifth, § 6, of the Connecticut constitution, as amended by article twenty-seven, § 2, of the amendments, and had been appointed a judge trial referee. The defendant refused to consent, pursuant to General Statutes § 52-434 (a) (1),[4] to a judge trial referee presiding over his resentencing and filed a motion requesting that the case be transferred to a judge of the Superior Court. Specifically, the defendant argued that, although General Statutes § 51-183g permits a judge trial referee to preside over certain "unfinished matters pertaining to causes theretofore tried before him," this provision does not permit a judge trial referee to resentence a defendant without the consent of both parties as required by § 52-434 (a) (1). Judge Fracasse denied the defendant's motion, stating that "the statute's clear that this court does have the authority to proceed with the remand from the Supreme Court

the defendant's sentence for the one remaining count of risk of injury to a child under § 53-21 cannot exceed ten years imprisonment, the maximum penalty. Thus, the defendant's sentence, which, we note, he already has served in full, will be shorter than the twelve year sentence imposed on the victim's mother, and we need not address this claim.

[1] General Statutes § 52-434 (a) (1) provides in relevant part: "The Superior Court may, with the consent of the parties or their attorneys, refer any criminal case to a judge trial referee who shall have and exercise the powers of the Superior Court in respect to trial, judgment, sentencing and appeal in the case, except that the Superior Court may, without the consent of the parties or their attorneys, (A) refer any criminal case, other than a criminal jury trial, to a judge trial referee assigned to a geographical area criminal court session, and (B) refer any criminal case, other than a class A or B felony or capital felony, to a judge trial referee to preside over the jury selection process and any voir dire examination conducted in such case, unless good cause is shown not to refer."

because it deals with a matter of unfinished matters pertaining to causes theretofore tried by me and this includes the remand for resentencing . . . ." Thereafter, on January 17, 2003, the trial court, after hearing arguments from both parties, rendered judgment sentencing the defendant to ten years imprisonment on one count of assault in the first degree, ten years imprisonment on the second count of assault, and ten years imprisonment on the one count of risk of injury to a child, each to be served consecutively, for a total effective sentence of thirty years imprisonment. The defendant then appealed to the Appellate Court from the trial court's judgment resentencing him and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. After hearing oral argument on the issues initially raised in this appeal, we ordered the parties to file supplemental briefs addressing two issues that we previously had resolved in *Miranda I.* Specifically, we ordered the parties to brief the following: "Should this court reconsider its conclusion in [*Miranda I,* supra, 245 Conn. 209], that the defendant could be convicted of assault in the first degree in violation of . . . § 53a-59 (a) (3)? More particularly, should we reexamine our conclusions that: (1) the failure to protect a child from abuse could constitute a violation of § 53a-59 (a) (3) for recklessly engaging in conduct that caused serious physical injury; and (2) the defendant, who was not a parent of the child victim, nevertheless had a legal duty under the circumstances of that case, to protect the victim from abuse by her parent?" The parties thereafter filed supplemental briefs as ordered.

I

The defendant's first claim on appeal is that Judge Fracasse, a judge trial referee, lacked the statutory authority to preside over the defendant's resentencing hearing. Specifically, the defendant claims that § 52-

434 (a) (1) allows a judge trial referee to preside over criminal proceedings only with the consent of both parties. Because the defendant expressly refused to consent to a judge trial referee, he claims that the trial court's reliance on § 51-183g, which permits a judge trial referee to settle and dispose of "all matters relating to appeal cases" and "unfinished matters" from his tenure as a Superior Court judge, was improper. The state maintains that the trial court properly concluded that § 51-183g permits a judge trial referee to resentence a defendant when he had presided over the defendant's trial as a Superior Court judge. We agree with the state. The six justices of this court who agree with this conclusion, however, do not arrive at that conclusion using the same analysis. The reasoning of these justices is set forth in the two concurring opinions issued herewith.

## II

After consideration of the supplemental briefs filed by the parties at our direction, we have decided to reconsider and reverse our conclusion in *Miranda I* that the defendant could be convicted of assault in the first degree in violation of § 53a-59 (a) (3) for failing to protect the victim from physical abuse by her mother. *Miranda I*, supra, 245 Conn. 230. We conclude that the principle of stare decisis does not bar us from reconsidering our prior interpretation of § 53a-59 (a) (3), because although that principle plays an important role in our system of jurisprudence, there are occasions when the goals of stare decisis are outweighed by the need to overturn a previous decision in the interest of reaching a just conclusion in a matter. We conclude that this is such an occasion.

"This court has repeatedly acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law." *Conway* v. *Wilton*, 238 Conn. 653, 658, 680 A.2d

242 (1996). The doctrine of stare decisis "is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency." Id., 658–59. Despite this adherence to past precedent, this court also has concluded that, "[t]he value of adhering to precedent is not an end in and of itself, however, if the precedent reflects substantive injustice. Consistency must also serve a justice related end." Id., 659. When a previous decision clearly creates injustice, "the court should seriously consider whether the goals of stare decisis are outweighed, rather than dictated, by the prudential and pragmatic considerations that inform the doctrine to enforce a clearly erroneous decision. . . . The court must weigh [the] benefits of [stare decisis] against its burdens in deciding whether to overturn a precedent it thinks is unjust." (Citation omitted; internal quotation marks omitted.) Id., 659–60. "It is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations." *Barden* v. *Northern Pacific R. Co.*, 154 U.S. 288, 322, 14 S. Ct. 1030, 38 L.Ed. 934 (1894). "[T]here is a well recognized exception to stare decisis under which a court will examine and overrule a prior decision that is clearly wrong." *White* v. *Burns*, 213 Conn. 307, 335, 567 A.2d 1195 (1990). "In short, consistency must not be the only reason for deciding a case in a particular way, if to do so would be unjust. Consistency obtains its value best when it promotes a just decision." *Conway* v. *Wilton*, supra, 662.

After careful reconsideration, we have become persuaded that our conclusion in *Miranda I*, supra, 245 Conn. 230, that the defendant could be convicted of assault in the first degree in violation of § 53a-59 (a) (3) was clearly wrong and should be overruled. The six justices of this court who agree with this conclusion

and join in this opinion do not, however, arrive at that conclusion by employing the same analysis. As a result, the reasoning of these six justices is set forth in the two concurring opinions issued herewith.

The judgment is reversed in part and the case is remanded with direction to dismiss the two counts of the information for assault in the first degree and for resentencing on the one count of risk of injury to a child.[5]

BORDEN, J., with whom NORCOTT and PALMER, Js., join, concurring. I agree with the conclusions of the per curiam opinion of this court that: (1) Judge Fracasse had the authority to preside over the resentencing proceeding of the defendant, Santos Miranda, despite the fact that Judge Fracasse had reached the mandatory retirement age of seventy; and (2) the defendant's conviction on counts five and ten of the substitute information for assault in the first degree must now be reversed, despite the fact that we previously affirmed those convictions in *State* v. *Miranda*, 245 Conn. 209, 715 A.2d 680 (1998) (*Miranda I*). I, along with the justices joining me in this concurring opinion, write separately to explain the analytical route by which we reach the first conclusion, and to explain why we have now changed our minds and votes regarding the second conclusion.

---

[5] In *Miranda II*, supra, 260 Conn. 129, we endorsed the Appellate Court's adoption of the "aggregate package" theory of sentencing. See *State* v. *Raucci*, 21 Conn. App. 557, 563, 575 A.2d 234, cert. denied, 215 Conn. 817, 576 A.2d 546 (1990). Pursuant to that theory, we must vacate a sentence in its entirety when we invalidate any part of the total sentence. On remand, the resentencing court may reconstruct the sentencing package or, alternatively, leave the sentence for the remaining valid conviction or convictions intact. *Miranda II*, supra, 129. Thus, we must remand this case for resentencing on the sole count on which the defendant stands convicted.

## I

The defendant claims that Judge Fracasse did not have authority, pursuant to General Statutes § 51-183g,[1] to resentence the defendant. Specifically, the defendant claims that the resentencing proceeding was not an "unfinished [matter]" within the meaning of that statute.[2] I disagree. I conclude, to the contrary, that Judge Fracasse did have that authority under § 51-183g.

As both this concurring opinion and the concurring opinion of Justice Vertefeuille indicate, the question of statutory interpretation presented by this issue is which of two statutes, namely, § 51-183g or General Statutes § 52-434 (a) (1),[3] applied to the resentencing of the

[1] General Statutes § 51-183g, formerly § 51-46, provides: "Any judge of the Superior Court may, after ceasing to hold office as such judge, settle and dispose of all matters relating to appeal cases, as well as any other unfinished matters pertaining to causes theretofore tried by him, as if he were still such judge."

[2] The state does not claim that the resentencing proceedings constituted "matters relating to appeals" within the meaning of § 51-183g. Consequently, the only question presented is whether those proceedings constituted "unfinished matters" as used in § 51-183g. In this connection, although in his brief in this court the defendant contended that "unfinished matters" was limited to "ministerial actions with respect to a case tried by [the judge] before retirement," at oral argument before this court the defendant abandoned that contention.

[3] General Statutes § 52-434 (a) (1) provides: "Each judge of the Supreme Court, each judge of the Appellate Court, each judge of the Superior Court and each judge of the Court of Common Pleas who ceases or has ceased to hold office because of retirement other than under the provisions of section 51-49 and who is an elector and a resident of this state shall be a state referee for the remainder of such judge's term of office as a judge and shall be eligible for appointment as a state referee during the remainder of such judge's life in the manner prescribed by law for the appointment of a judge of the court of which such judge is a member. The Superior Court may refer any civil, nonjury case or with the written consent of the parties or their attorneys, any civil jury case pending before the court in which the issues have been closed to a judge trial referee who shall have and exercise the powers of the Superior Court in respect to trial, judgment and appeal in the case, and any proceeding resulting from a demand for a trial de novo pursuant to subsection (e) of section 52-549z may be referred without the consent of the parties to a judge trial referee who has been specifically designated to hear such proceedings pursuant to subsection (b) of this

defendant following our remand after *State* v. *Miranda*, 260 Conn. 93, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002) (*Miranda II*). If § 51-183g applied, Judge Fracasse was authorized to resentence the defendant because the resentencing constituted an "unfinished [matter], pertaining to [a cause] theretofore tried by him . . . ." If, however, the resentencing constituted the "refer[ral]" of a "criminal case" within the meaning of § 52-434 (a) (1), Judge Fracasse was not authorized to resentence without the defendant's consent, because the matter did not come within any of the instances provided for in § 52-434 (a) (1) for such a referral without such consent.

This tension between the potential applicability of two statutes, with different outcomes, presents a classic case of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation

section. The Superior Court may, with the consent of the parties or their attorneys, refer any criminal case to a judge trial referee who shall have and exercise the powers of the Superior Court in respect to trial, judgment, sentencing and appeal in the case, except that the Superior Court may, without the consent of the parties or their attorneys, (A) refer any criminal case, other than a criminal jury trial, to a judge trial referee assigned to a geographical area criminal court session, and (B) refer any criminal case, other than a class A or B felony or capital felony, to a judge trial referee to preside over the jury selection process and any voir dire examination conducted in such case, unless good cause is shown not to refer."

marks omitted.) *State* v. *Courchesne*, 262 Conn. 537, 562 n.20, 816 A.2d 562 (2003).[4]

Because, subsequent to our decision in *Courchesne*, the legislature enacted General Statutes § 1-2z; see footnote 4 of this opinion; I next address the relationship of that statute to the task of interpretation presented by this case. Section 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Thus, pursuant to § 1-2z, we are to go through the following initial steps: first, consider the language of the statute at issue, including its relationship to other statutes, as applied to the facts of the case; second, if after the completion of step one, we conclude that, as so applied, there is but one likely or plausible meaning of the statutory language, we stop there; but third, if after the completion of step one, we conclude that, as applied to the facts of the case, there is more than one likely or plausible meaning of the statute, we may consult other sources, beyond the statutory language, to ascertain the meaning of the statute.

It is useful to remind ourselves of what, in this context, we mean when we say that a statutory text has a "plain meaning," or, what is the same, a "plain and unambiguous" meaning. This court has already defined that phrase. "By that phrase we mean the meaning that

[4] As we have previously stated, General Statutes § 1-2z "legislatively overruled that part of *Courchesne* in which we stated that we would not require a threshold showing of linguistic ambiguity as a precondition to consideration of sources of the meaning of legislative language in addition to its text." *Paul Dinto Electrical Contractors, Inc.* v. *Waterbury*, 266 Conn. 706, 716 n.10, 835 A.2d 33 (2003). Thus, the legislature did not purport to overrule our judicial definition of the task of statutory interpretation.

is so strongly indicated or suggested by the language as applied to the facts of the case, without consideration, however, of its purpose or the other, extratextual sources of meaning . . . that, when the language is read as so applied, it appears to be *the* meaning and appears to preclude any other likely meaning." (Emphasis in original.) *State* v. *Courchesne,* supra, 262 Conn. 573–74 n.30. Put another way, if the text of the statute at issue, considering its relationship to other statutes, would permit more than one likely or plausible meaning, its meaning cannot be said to be "plain and unambiguous."

Although I ultimately conclude that § 51-183g, rather than § 52-434 (a) (1), applies to this case, I do not think that that meaning is plainly and unambiguously required by the language of § 51-183g to the exclusion of § 52-434 (a) (1). As I indicate later in this opinion, the argument that § 52-434 (a) (1), rather than § 51-183g, applies to this case *is* reasonable and plausible, and, therefore, neither statute plainly and unambiguously applies to this case.[5]

---

[5] Thus, I disagree with the approach taken by Justice Vertefeuille in her concurring opinion. Instead of first determining whether there is any contrary interpretation of the two statutes that is reasonable and plausible, she has conflated two separate analyses: (1) whether the meaning of a particular statutory text, taken together with other statutes is plain and unambiguous; and (2) what the more likely or probable—or even the strongly suggested—meaning of that text is after a full textual analysis. The two are simply not the same. This conflationary flaw results in a transformation of the plain meaning rule from a threshold determination of ambiguity into the following result: once the court has examined the statutory texts and arrived at a conclusion as to the meaning on the basis of those texts, that meaning becomes ex post facto, plain and unambiguous, and resort to extratextual sources of meaning are then barred. That is contrary to the mandate of § 1-2z.

That approach to the threshold issue of determining whether the statutory language is plain and unambiguous effectively treats that task as one aimed merely at discerning the more, or perhaps, most *plausible* meaning based on the analysis of the statutory text and the statute's relation to other statutes. This recasting of the requirements of § 1-2z effectively sets the bar to consideration of extratextual sources of statutory meaning higher than the legislature itself intended in the enactment of § 1-2z and ignores our

I note that *both* the state and the defendant claim that the plain meaning of the applicable statutory language favors their respective interpretations. "[W]e have stated that statutory language does not become ambiguous merely because the parties contend for different meanings. . . . *Glastonbury* Co. v. *Gillies*, 209 Conn. 175, 180, 550 A.2d 8 (1988). Yet, if parties contend for different meanings, and each meaning is plausible, that is essentially what ambiguity ordinarily means in such a context in our language. See Webster's Third New International Dictionary, and Merriam-Webster's Collegiate Dictionary (10th Ed.), for the various meanings of ambiguity and ambiguous in this context. For example, in Merriam-Webster's Collegiate Dictionary, the most apt definition of ambiguous for this context is: [C]apable of being understood in two or more possible senses or ways." (Internal quotation marks omitted.) *State* v. *Courchesne*, supra, 262 Conn. 571–72. In my view, that is the case here.

First, linguistically § 52-434 (a) (1) requires the consent of both parties before the Superior Court may "refer" any criminal case to a judge trial referee. Among the dictionary definitions of "refer" that could reasonably apply to a case allotted to a judge trial referee for resentencing are "to send or direct for treatment, aid, information, decision," and "to direct attention." Webster's Third International Dictionary. As a procedural matter, upon our remand for resentencing, someone— either a clerk or perhaps the presiding judge for criminal matters—must "send or direct" the file to the judge trial referee for that resentencing, or "direct [the] attention" of the judge trial referee to the file.[6] Under this

own precedent setting forth the meaning of "plain and unambiguous" statutory language.

[6] The concurring opinion of Justice Vertefeuille, rather than explaining why this interpretation is not even plausible, simply asserts that § 52-434 (a) (1) "contemplates the referral of a criminal case to a judge trial referee *prior to trial* and authorizes the judge trial referee to preside over the trial and all subsequent proceedings." (Emphasis in original.) Although this

dictionary definition, it would be reasonable to conclude that § 52-434 (a) (1) applies to this case, rather than § 51-183g.

Second, § 51-183g was enacted in 1929,[7] whereas the particular parts of § 52-434 (a) (1) involved here were enacted in 1994 and 1998.[8] Furthermore, § 51-183g applies to all cases, civil and criminal, whereas the particular part of § 52-434 (a) (1) that is at issue here, namely, the consent provision, applies only to criminal cases. Thus, it is plausible to read the latter, more explicit statute, § 52-434 (a) (1), as applying specifically to criminal cases, as differentiated from the situations contemplated by the earlier, more general statute, § 51-183g.

Finally, reading § 52-434 (a) (1) in its entirety, it is plausible to conclude that the legislature was quite specific about which types of cases could or could not be referred to judge trial referees, and this specificity reflected carefully considered policy choices. For example, with respect to civil cases: civil nonjury cases and demands for trials de novo pursuant to General

assertion may—or may not—be correct as a matter of statutory interpretation, a question that we need not answer in the present case, it certainly cannot be gleaned just from looking at the language of § 52-434 (a) (1). The words, *"prior to trial,"* emphasized by that opinion, do not appear anywhere in the statutory language.

In addition, that concurring opinion concludes that "[§] 51-183g applies to situations where the judge trial referee was a judge at the time the trial started and became a judge trial referee at a subsequent time. Section 52-434 (a) (1) applies to matters referred to a judge trial referee for trial when he or she already is a referee." It may well be that these two conclusions are correct. It cannot be, however, that either conclusion is so obvious that the statutes plainly and unambiguously have those meanings, because nowhere in the language of either statute does either conclusion appear. Thus, to the extent that this analysis by that concurring opinion supports the inapplicability of § 52-434 (a) (1), it certainly does not come from the plain text of that statute.

[7] See Public Acts 1929, c. 301, § 10.

[8] See Public Acts 1994, No. 94-63 and Public Acts 1998, No. 98-245.

Statutes § 52-549z may be so referred without the parties' consent; but civil jury cases in which the pleadings have been closed may only be so referred with the parties' consent.

With respect to criminal cases, the legislature was even more explicit. The parties' consent is required for the referral of "any criminal case," with the following specific exceptions: a criminal nonjury case may be referred without consent to a judge trial referee assigned to a geographical area court; and criminal cases, other than Class A or B felonies or capital felonies, may be so referred for jury selection only, "unless good cause is shown not to refer." General Statutes § 52-434 (a) (1). Thus, it is plausible that the legislature was seriously concerned with the referral of criminal matters to judge trial referees, and made a considered policy choice to limit those referrals without the consent of the parties to very limited classes of cases. The present case does not come within any of those limited classes, and it is plausible to interpret the two statutes so as not to countermand that considered policy choice of the legislature.

I conclude, therefore, that the meaning of neither § 51-183g nor § 52-434 (a) (1) is plain and unambiguous as applied to the facts of this case. Therefore, I proceed to the question of statutory interpretation unconfined by the provisions of § 1-2z to textual sources of meaning alone. Applying this method of statutory interpretation, I conclude that § 51-183g applies to the present case and, therefore, that Judge Fracasse had the authority to resentence the defendant.

I look first to the language of the statute. That language is broad and inclusive in nature: "any other unfinished matters . . . ." General Statutes § 51-183g. That language is broad enough to include a resentencing following a remand by this court for that purpose, and

that breadth strongly suggests that it does include such a remand. In this connection, the word "unfinished" as used in this context is capable of such a broad meaning: "not brought to an end or to completion." Webster's Third New International Dictionary.[9] Furthermore, the language in § 51-183g, "as if he were still such a judge," is also broad enough to include a resentencing following an appellate remand, because if Judge Fracasse were still a judge, rather than a judge trial referee, he undoubtedly would have had that power.

Additionally, that language must be read in light of the fundamental jurisprudential notion that "[t]he trial of a criminal case, and the ensuing appeal from the judgment of conviction, are not separate and distinct proceedings divorced from one another. They are part of the continuum of the process of adjudication." (Internal quotation marks omitted.) *Bunkley* v. *Commissioner*, 222 Conn. 444, 459, 610 A.2d 598 (1992). Therefore, when a case, following an appeal, is remanded to the trial court for resentencing, the resentencing hearing is not a totally new proceeding; it is a continuation of the adjudicatory process that began in the trial court and was left incomplete by the subsequent remand after determination of the appeal. This jurisprudential notion also strongly suggests that the resentencing proceeding in this case was appropriately considered an "unfinished matter" within the meaning of § 51-183g.

In addition, this interpretation is consistent with the state constitutional provision regarding the powers of

---

[9] This is not to say, however, that this is "the" meaning of the term "unfinished." "A dictionary is nothing more than a compendium of the various meanings and senses in which words have been used in our language. A dictionary does not define the words listed in it in the sense of stating what those words mean universally. Rather it sets out the range of meanings that may apply to those words as they are used in the English language, depending on the varying contexts of those uses." *Northrop* v. *Allstate Ins. Co.*, 247 Conn. 242, 250, 720 A.2d 879 (1998).

state referees. Article fifth, § 6, of the constitution of Connecticut, as amended by article eight, § 2, of the amendments, provides in relevant part: "No judge shall be eligible to hold his office after he shall arrive at the age of seventy years, *except that . . . a judge of the superior court . . . who has attained the age of seventy years and has become a state referee may exercise, as shall be prescribed by law, the powers of the superior court . . . on matters referred to him as a state referee.*" (Emphasis added.) The emphasized language was added to the constitution as part of the 1965 constitution, in order to make our system more efficient by granting referees, who prior thereto did not have the full powers of judges in cases referred to them, those full powers. See Conn. Constitutional Convention, Constitutional Committee Hearings, Resolutions and Rules, (August 24, 1965) p. 35, remarks of former Justice Abraham S. Bordon, then judge trial referee ("I have a feeling that for the future efficiency of our court system that it would be preferable for judges who reach the age of seventy to retire but remain as judges . . . . I have a feeling that there has been a lot of waste in the energies of the State Referees in that they have no power to enter any orders which may come during the trial of a case before a State Referee."); see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1967 Sess., p. 485, remarks of former Chief Justice Raymond E. Baldwin, then judge trial referee (proposed language "gives the additional powers of a state referee in a matter referred to him, to render a judgment, so that any attempt to attack the finding or any effort at an appeal, requires the same procedure as it requires . . . in an appeal from a Judge of the Superior Court or Court of Common Pleas so that we avoid all this procedural rigamarole that we used to have and it also gives him the right to decide questions of law as well as to resolve issues of fact"). Although § 51-183g predates that consti-

tutional provision, and although its statutory predecessor had been held to be constitutional before the adoption of that provision; see *Johnson* v. *Higgins*, 53 Conn. 236, 1 A. 616 (1885); it is consistent with the purpose of that provision to interpret § 51-183g to include the power to resentence following an appellate remand.

Finally, given this analysis, which strongly suggests that, prior to the enactment of the consent provisions of § 52-434 (a) (1) in 1994 and 1998, § 51-183g included the power to resentence upon remand, it is unlikely that when the legislature did enact those provisions it intended implicitly to amend § 51-183g by carving out an exception for criminal resentencing on a remand. There is nothing in the legislative history of that subsequent legislation to suggest that, and not enough in its language to compel such a conclusion. Our ordinary presumptions are strongly against amendment by implication. *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 718, 855 A.2d 212 (2004). Indeed, the legislative history of the 1998 legislation suggests a legislative intent that a criminal trial to the court, rather than the jury, could be referred to a judge trial referee without the defendant's consent. See 41 H.R. Proc., Pt. 15, 1998 Sess., pp. 5081–82. This suggestion undermines the contention implicit in the defendant's argument, that the legislative policy regarding the necessity of such consent in the specified cases was so strong that it should be held to be inconsistent with a concomitant authority to resentence under § 51-183g.

Thus, I disagree with the defendant's suggestion that giving § 51-183g this construction may lead to a conflict with both article fifth, § 6, of the constitution of Connecticut, and with § 52-434 (a) (1) itself. As I have indicated, I see no conflict with article fifth, § 6, of the constitution of Connecticut, as amended by article

eight, § 2, of the amendments, which permits the exercise by a referee of powers of a judge "as . . . prescribed by law . . . ." Section 51-183g is such a law. Furthermore, I see no necessary conflict in concluding, as I do, that a resentencing following a remand comes within the "unfinished matters" language of § 51-183g, and not within the "refer[ral]" of criminal matters language of § 52-434 (a) (1). Although, as I indicated previously, "referral" could bear such a meaning, I do not think it does have that meaning in the context of a resentencing following an appellate remand. The reasons to the contrary are simply more persuasive.

## II

I turn now to the principal question in the case, namely, whether the defendant's convictions under counts five and ten of the information for assault in the first degree must now be reversed. Again, I agree with the result reached by this court in part II of its per curiam opinion, namely, that the convictions must be reversed. I now conclude, however, that the provisions of General Statutes § 53a-59 (a) (3),[10] under which the defendant was convicted in counts five and ten of the information, do not apply to the defendant's conduct.[11]

---

[10] General Statutes § 53a-59 (a) provides: "A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."

[11] Although I was one of four members of this court to have voted to affirm the defendant's convictions in *Miranda I*, upon careful reconsideration I am now persuaded that my vote at that time was wrong and that it is better to correct the error now, while it still benefits the defendant in the present case, than to wait for the issue to present itself in a future case. "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee* v. *Union Planters National Bank & Trust Co.*, 335 U.S. 595, 600, 69 S. Ct. 290, 93 L. Ed. 259, reh. denied, 336 U.S. 915, 69 S. Ct. 601, 93 L. Ed. 1078 (1949) (Justice Frankfurter, on changing position he had taken in earlier case).

The defendant was not the perpetrator of the physical assaults on the victim. *Miranda I*, supra, 245 Conn. 211. The perpetrator was the victim's mother. Id. The defendant, however, who was the boyfriend of the child's mother, "had established a family-like relationship with the mother and her two children . . . had voluntarily assumed responsibility for the care and welfare of both children, and . . . had considered himself the victim's stepfather . . . ." Id., 218. On the basis of these facts, the court in *Miranda I* concluded that "there existed a common-law duty to protect the victim from her mother's abuse, the breach of which can be the basis of a conviction under § 53a-59 (a) (3)." Id. The court's chain of reasoning was that: (1) parents may be criminally liable for assault by inaction, as opposed to action, based on common-law duties to protect their children; id., 214–17; (2) recognition by the courts of such a duty and the criminal consequences of its breach is permitted by General Statutes § 53a-4; id., 219–20; (3) this duty has been recognized as applying, in addition to biological and adoptive parents and legal guardians, to other adults who establish familial relationships with and assume responsibility for the care of a child; id., 222–26; (4) there is a continuing demographic trend reflecting a significant increase in nontraditional alternative family arrangements; id., 228; and (5) to ascribe such a duty to the defendant under the facts of the case would be harmonious with the public policy of preventing children from abuse and with the concomitant general policy underlying General Statutes § 53-21, the risk of injury statute that applies to *any* person. Id., 228–30. Thus, the linchpin of the court's reasoning was that there is a recognized common-law duty of a parent or legal guardian to protect his or her child from abuse, the breach of which may constitute assault under our Penal Code pursuant to § 53a-4; and the defendant, although neither a parent

nor legal guardian, was subject to the same duty because he had established a familial relationship with the victim's mother, had assumed the responsibility for the victim's care, and considered himself the victim's stepfather.

In my view, it is not necessary to decide in the present case whether a parent or legal guardian can be held criminally liable under § 53a-59 (a) (3) for failing to protect his child from physical abuse by another. I would leave that question to a case that squarely presents it. I conclude, instead, that, assuming without deciding that a parent or legal guardian could be held so liable, a person in the defendant's position—neither a parent nor a legal guardian—may not be so held criminally liable.[12]

Contrary to the concurring opinion of Justice Vertefeuille, I do not think that the question of whether there can be criminal liability for a failure to act necessarily can be decided solely by reference to the language and legislative history of the assault statutes. Section 53a-4, which is entitled "Saving clause," provides: "The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions." Although, as Justice Vertefeuille's opinion indicates, a strong case may be made that our assault statutes preclude any criminal liability based on the omission of conduct, as opposed to active conduct, a strong case may also be made that, consistent with the great weight of authority elsewhere, as our opinion in *Miranda I* indicated, § 53a-4 would permit this court to recognize the principle of criminal liability based on the failure to act where there is a clear legal duty to act, such as where parents or legal guardians are concerned.

---

[12] I would leave the criminal liability of the defendant to the risk of injury statute, namely, § 53-21, the applicability of which the defendant has never challenged.

Contrary to my earlier vote in this case, however, I do not now think that such potential parental liability should be extended, on a case-by-case basis, beyond the clearly established legal categories of a parent or legal guardian. Section 53a-4 permits this court to recognize "other principles of criminal liability . . . ." Whether to do so, however, poses a question of policy for this court. I am now of the opinion that it would be unwise policy to make such an extension.

First, as I have already indicated, parents and guardians fall into clearly recognized legal categories, and their duty to protect their children and wards are clearly recognized in the law. The same cannot be said for someone like the defendant. It simply goes too far to say that he should be treated precisely the same as a parent or legal guardian for purposes of criminal liability, because he had established a "familial relationship" with the victim's mother, had assumed responsibility for the victim's care, and considered himself her stepfather. It will be difficult to cabin this precedent to these precise facts, and the temptation will always be there, in a case of egregious injuries—as this case is—to extend it to other members of the extended family, to longtime caregivers who are not related to either the parent or victim, to regular babysitters, and to others with regular and extended relationships with the abusing parent and the abused victim.

Second, and closely related to the first reason, the emerging demographic trend toward nontraditional alternative family arrangements, which we cited as support in *Miranda I*, now strikes me as a counter argument. Precisely because of that trend, and the concomitant difficulty of determining in advance where it will lead and what its ultimate contours will be, the boundaries of this duty-based criminal liability will be too amorphous, and too fact-based and based on hindsight, to fit comfortably within our Penal Code.

Third, this amorphousness in where the outer limits of liability lie will discourage others, such as volunteers and close friends, from establishing "familial relationships" with the children who are likely to be the most in need of them. Child abuse is often associated with such demographic factors as single parent status, low socioeconomic status, inadequate education, and low intelligence. J. Cordone, "Protecting Or Handicapping Connecticut's Children: *State* v. *Miranda*," 32 Conn. L. Rev. 329, 348 (1999). Thus, the children who are the most at risk for abuse are likely to suffer the greatest harm from this amorphous criminal liability, because it will discourage well-meaning relatives, friends of the family and other members of the community from taking an active and intense interest in them, for fear of being caught in a web of criminal liability for the egregious conduct of another.

Finally, I think that *Miranda I* places too much power in the hands of the state to use as a bargaining chip in plea negotiations. Precisely because its boundaries are so amorphous, it gives the state the power to threaten its use in a different but similar case, in order to extract a plea that the state might not otherwise be able to secure.

I conclude, therefore, that the defendant cannot, as a matter of law, be convicted of assault in the first degree, and that the judgments of conviction on counts five and ten of the information must reversed, and a judgment of acquittal be rendered on those counts.

VERTEFEUILLE, J., with whom, SULLIVAN, C. J., and ZARELLA, J., join, concurring. I concur with the two conclusions set forth in the accompanying per curiam opinion, and set forth my reasoning, and those of the justices joining me, in this concurring opinion.

## I

The first conclusion reached in the per curiam opinion is that Judge Fracasse, a judge trial referee, properly resentenced the defendant, Santos Miranda, pursuant to General Statutes § 51-183g, following our remand in *State* v. *Miranda*, 260 Conn. 93, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002) (*Miranda II*). The per curiam opinion rejects the defendant's claim that General Statutes § 52-434 (a) (1) applied to the defendant's resentencing and required the defendant's consent before he could be resentenced by a judge trial referee.

In order to determine whether a judge trial referee is authorized to preside over a resentencing hearing following remand from the Appellate Court, we must construe the relevant statutory provisions, namely, §§ 51-183g and 52-434 (a) (1). The question of whether resentencing constitutes an unfinished matter within the meaning of § 51-183g or whether § 52-434 (a) (1) requires the parties' consent to resentencing by a judge trial referee presents questions of statutory interpretation over which our review is plenary.[1] See *Waterbury* v. *Washington*, 260 Conn. 506, 546–47, 800 A.2d 1102 (2002).

"The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and

---

[1] In his initial brief to this court, the defendant addressed both the "unfinished matters" and "appeal cases" clauses of § 51-183g. The state in its brief, however, addressed only the "unfinished matters" clause. In his reply brief, the defendant noted that the state addressed only the "unfinished matters" clause, and therefore recognized that the salient question on appeal is whether a resentencing hearing constitutes an unfinished matter, not an appeal case. Moreover, at oral argument before this court, the defendant specifically limited his argument to the "unfinished matters" language. Further, at oral argument, when questioned about which clause it was addressing, the state indicated that it considered the "unfinished matters" language to refer to a broad category that encompasses the "appeal cases" clause. Accordingly, we limit our analysis to the "unfinished matters" language.

its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.[2] In the present case, I conclude that the meaning of §§ 51-183g and 52-434 (a) (1) is plain and unambiguous.

Before I turn to the text of the statutes at issue, I note that the constitution of Connecticut, article fifth, § 6, as amended by article eight, § 2, of the amendments, establishes a mandatory retirement age of seventy for all judges. Under that constitutional provision, upon attaining the age of seventy, a retired judge may become a state referee and "may exercise, as shall be prescribed by law, the powers of the superior court or court of common pleas on matters referred to him as a state referee." Id. State referees may be designated as judge trial referees and, accordingly, may preside over civil and criminal cases. General Statutes § 52-434 (b). Section 52-434 (a) (1) delineates the manner in which cases, both civil and criminal, may be referred to a judge trial referee. As to criminal cases, § 52-434 (a) (1) provides in relevant part: "The Superior Court may, with the *consent* of the parties or their attorneys, refer any *criminal* case to a judge trial referee who shall have and exercise the powers of the Superior Court in respect to trial, judgment, sentencing and appeal in the case . . . ." (Emphasis added).

Because the matter in the present case is criminal in nature and the defendant refused to consent to a judge trial referee, the crux of the issue presented is whether a resentencing hearing, on remand after appeal, constitutes an unfinished matter within the meaning of § 51-

---

[2] Section 1-2z was enacted in order to overrule our rejection of the plain meaning rule in *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003).

183g, thereby allowing a judge trial referee to preside without the consent of the parties, or whether § 52-434 (a) (1) applies and the consent of the parties is required. To resolve this issue, I begin with the language of the statutes. Section 51-183g provides that, "[a]ny judge of the Superior Court may, after ceasing to hold office as such judge, settle and dispose of all matters relating to appeal cases, as well as any other *unfinished matters* pertaining to causes theretofore tried by him, *as if he were still such judge.*" (Emphasis added). The phrase "unfinished matters" is not defined by the statute.

General Statutes § 1-1 (a) provides in relevant part: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . ." In order to determine the commonly approved usage of language in a statute, we refer to the definition of a word as found in a dictionary. Webster's Third New International Dictionary defines "unfinished" as "not brought to an end or to completion . . . ." The text of § 51-183g therefore provides that a person who has ceased to be a Superior Court judge may dispose of any matter relating to a case previously tried by him or her as a judge that was not completed before he or she ceased to be a Superior Court judge. Based on its express language, § 51-183g plainly applies to the circumstances in the present case. The defendant's case initially was tried before Judge Fracasse as a Superior Court judge in 1994. At the time of resentencing in 2003 on remand after the most recent appeal in this case, Judge Fracasse had become a judge trial referee after ceasing to be a Superior Court judge because he reached the mandatory retirement age of seventy. Consent of the parties therefore was not required for Judge Fracasse to preside at the defendant's resentencing.

Analysis of the text of § 52-434 (a) (1), on which the defendant relies, reveals that it applies to different

circumstances from those in the present case. Specifically, § 52-434 (a) (1), which requires the consent of the parties, contemplates the referral of "any criminal case to a judge trial referee who shall have and exercise the powers of the Superior Court in respect to *trial, judgment, sentencing and appeal* in the case . . . ." (Emphasis added.) The breadth of this language strongly suggests that the statute contemplates the referral of a criminal case to a judge trial referee *prior to trial* and authorizes the judge trial referee to preside over the trial and all subsequent proceedings. Those are not the circumstances of the present case.

Section 51-183g plainly, however, pertains exclusively to "appeal cases" and other "unfinished matters pertaining to causes *theretofore tried by [the judge] as if he or [she] were still such judge.*" (Emphasis added.) Thus, § 51-183g, which does not require the consent of the parties, applies by its express terms to matters that were tried at a time when the referee was a Superior Court judge and have carried over from his or her prior tenure as a trial judge. I conclude, therefore, that § 51-183g plainly authorized Judge Fracasse to resentence the defendant, without the consent of the parties, after the case was remanded for resentencing after appeal, and the trial court properly determined that it had the statutory authority to resentence the defendant.

The defendant advocates for a narrow reading of § 51-183g. Specifically, the defendant interprets § 51-183g to refer only to unfinished matters that are ministerial in nature. This interpretation finds no support in the text of the statute itself and runs afoul of several well established principles of statutory construction.

"It is our duty to interpret statutes as they are written. . . . Courts cannot, by construction, read into statutes provisions which are not clearly stated. . . . The legislature is quite aware of how to use language when it

wants to express its intent to qualify or limit the operation of a statute." (Citations omitted; internal quotation marks omitted.) *State* v. *Ingram*, 43 Conn. App. 801, 825, 687 A.2d 1279 (1996), cert. denied, 240 Conn. 908, 689 A.2d 472 (1997). Additionally, "[a]s a general rule of statutory interpretation, we will not read a statute in such a way as to render a portion of it superfluous." *State* v. *Christiano*, 228 Conn. 456, 472, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994).

The defendant's interpretation is in derogation of both of these principles. There is no indication in the text of § 51-183g that the legislature intended to limit a judge trial referee to the performance of ministerial acts. Indeed, the language of the statute suggests the contrary, that the legislature did *not* intend to impose such a restriction. Section 51-183g specifically provides that a judge trial referee may settle and dispose of unfinished matters "as if he were still such judge." It is beyond dispute that a judge of the Superior Court has the authority to perform both ministerial and discretionary tasks. See, e.g., *State* v. *Francis*, 267 Conn. 162, 181, 836 A.2d 1191 (2003) (subject to sixth amendment to federal constitution, restrictions on scope of cross-examination are within discretion of trial judge); *State* v. *Reynolds*, 264 Conn. 1, 117, 836 A.2d 224 (2003) (trial court vested with wide discretion in determining competency of jurors to serve), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Anderson*, 212 Conn. 31, 47, 561 A.2d 897 (1989) (sentencing judge has broad discretion in imposing sentence within statutory limits). Therefore, by authorizing a judge trial referee to settle and dispose of unfinished matters "as if he were still such judge," § 51-183g contemplates both ministerial and discretionary acts.

The defendant next claims that a broad reading of § 51-183g would create an impermissible constitutional

conflict. Specifically, the defendant contends that if § 51-183g is read to allow a judge trial referee to perform discretionary acts, it would conflict with the constitutionally mandated retirement age of seventy. I disagree.

"It is fundamental . . . that this court reads statutes so as to avoid, rather than to create, constitutional questions. . . . More specifically, [i]n choosing between two statutory constructions, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Citation omitted; internal quotation marks omitted.) *Barton* v. *Ducci Electrical Contractors, Inc.*, 248 Conn. 793, 829, 730 A.2d 1149 (1999).

In the present case, interpreting the "unfinished matters" clause of § 51-183g to include ministerial and discretionary acts does not result in a constitutional conflict. In fact, this broad reading comports with the mandate of the constitution of Connecticut, article fifth, § 6, as amended by article eight, § 2, of the amendments, that "a judge of the superior court . . . who has attained the age of seventy years and has become a state referee may exercise . . . the *powers of the superior court* . . . ." (Emphasis added.) As I previously have noted, a judge of the Superior Court is vested with the authority to undertake discretionary actions. Therefore, because the state constitution directs a judge trial referee to exercise "the powers of the superior court"; id.; interpreting § 51-183g to permit a judge trial referee to preside over any unfinished matter, regardless of the level of discretion involved, is consistent with the dictate of article fifth, § 6, as amended.

The defendant further claims that reading § 51-183g to encompass resentencing on remand impermissibly would conflict with § 52-434 (a) (1), which requires the consent of the parties before a judge trial referee can

be referred a criminal case. As previously addressed herein, I do not perceive any conflict. Section 51-183g applies to situations where the judge trial referee was a judge at the time the trial started and became a judge trial referee at a subsequent time. Section 52-434 (a) (1) applies to matters referred to a judge trial referee for trial when he or she already is a referee.

The defendant further claims that the textual distinctions between §§ 52-434 (a) (1) and 51-183g reveal the legislature's intent to limit judge trial referees to ministerial duties. Specifically, the defendant points to the language in § 52-434 (a) (1) that specifically authorizes judge trial referees to "have and exercise the powers of the Superior Court . . . ." This, the defendant maintains, recognizes the full scope of a judge trial referee's authority and is in stark contrast to the two limited situations, namely, "appeal cases" and "unfinished matters," delineated in § 51-183g. This argument, however, fails to consider the last line of § 51-183g, which permits a judge trial referee to settle and dispose of matters "as if he were still such judge." I can conceive of no reasonable distinction between exercising the "powers of the Superior Court" as authorized in § 52-434 (a) (1) and functioning as if one "were still such judge" pursuant to § 51-183g. As I already have stated, judges of the Superior Court are not limited to the performance of ministerial tasks. Accordingly, I find this distinction unavailing.

Finally, the defendant claims that this court's opinion in *Griffing* v. *Danbury*, 41 Conn. 96 (1874), requires us to construe § 51-183g narrowly so as to prevent a judge trial referee from presiding over a resentencing hearing. In *Griffing*, this court concluded that a judge lacked authority to rule on a motion two days after his *resignation* took effect. Id. The one page opinion sets forth the unanimous conclusion of the court without analysis and without any reference to statutory, consti-

tutional or common-law precedent. I conclude that the brief opinion in *Griffing*, which arises in the context of a judge who resigned rather than retired, is not at all instructive with regard to the proper interpretation of § 51-183g.

## II

I also concur with the conclusion set forth in the accompanying per curiam opinion that *State* v. *Miranda*, 245 Conn. 209, 715 A.2d 680 (1998) (*Miranda I*), must be overruled. I do so because, in my view, a failure to act cannot constitute assault within the meaning of General Statutes § 53a-59 (a) (3).[3]

In *Miranda I*, this court concluded that the defendant, who was not the biological or legal parent of the child victim, could be convicted of assault in the first degree in violation of § 53a-59 (a) (3) for failing to protect his girlfriend's child from physical abuse by her mother. The majority first concluded, after a brief analysis that did *not* address the text of the statute or its legislative history, that the failure to act can be punishable as an assault under § 53a-59 (a) (3). Id., 217. The majority thereafter determined, after a lengthier analysis, that under the facts of the present case, "there existed a common-law duty to protect the victim from her mother's abuse, the breach of which can be the basis of a conviction under § 53a-59 (a) (3)." Id., 218. I disagree with the initial premise in *Miranda I*, that a failure to act can constitute assault under § 53a-59 (a) (3), and therefore I do not address the secondary issue concerning the defendant's legal duty.

I begin with the text of § 53a-59 (a) (3), which was not addressed in the majority opinion in *Miranda I*.[4]

---

[3] See footnote 2 of the accompanying per curiam opinion.

[4] I acknowledge that in the majority opinion in *Miranda II*, supra, 260 Conn. 106, which I authored, we stated that we had examined the plain language of § 53a-59 (a) (3) in *Miranda I*. Simply put, I was wrong in making that statement.

Whenever this court interprets a statute, "the language of the statute is the most important factor to be considered, for three very fundamental reasons. First, the language of the statute is what the legislature enacted and the governor signed. It is, therefore, the law. Second, the process of interpretation is, in essence, the search for the meaning of that language as applied to the facts of the case, including the question of whether it does apply to those facts. Third, all language has limits, in the sense that we are not free to attribute to legislative language a meaning that it simply will not bear in the usage of the English language." *State* v. *Courchesne*, 262 Conn. 537, 563–64, 816 A.2d 562 (2003).[5]

Section § 53a-59 (a) provides in relevant part: "A person is guilty of *assault* in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly *engages in conduct* which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ." (Emphasis added.) The statute does not define the words "assault" or "conduct," both of which are key terms in § 53a-59 (a) (3). When a statute does not define a term, "it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *State* v. *Love*, 246 Conn. 402, 408, 717 A.2d 670 (1998).

According to common understanding as expressed in dictionary definitions, "assault" is a crime caused by affirmative action. Webster's Third New International Dictionary defines assault as "a violent attack with physical means" and, alternatively, as an attempt or threat to do violence without actually inflicting the violence. Black's Law Dictionary (8th Ed. 2004) further

---

[5] Although our conclusion in *State* v. *Courchesne*, supra, 262 Conn. 569–70, rejecting the "plain meaning" rule of statutory interpretation was legislatively overruled by § 1-2z, our emphasis on the importance of the text of a statute is consistent with § 1-2z.

defines assault as "[t]he threat or use of force on another that causes that person to have a reasonable apprehension of imminent harmful or offensive conduct" or "[a]n attempt to commit battery requiring the specific intent to cause physical injury." An accompanying commentary to that definition of assault provides: "In popular language [assault] has always connoted a physical attack. When we say that D assaults V, we have a mental picture of D *attacking* V, by striking or pushing or stabbing him." (Emphasis added.) Id.

Likewise, the common understanding of "engages in conduct" connotes affirmative action. The term "engage" is defined as "[t]o employ or involve oneself; to take part in; to embark on." Id. Webster's Third New International Dictionary similarly defines engage as "to employ or involve oneself . . . to take part: participate . . . ." Webster's Third New International Dictionary defines conduct as "the act, manner, or process of carrying out (as a task) or carrying forward (as a business, government or war) . . . ."

Although the dictionary definitions are strongly suggestive of interpreting § 53a-59 (a) (3) as requiring affirmative conduct, I cannot say the statute is plain and unambiguous with regard to whether a failure to act can constitute an assault. See General Statutes § 1-2z. I therefore consult extratextual evidence with regard to the meaning of the statute. I begin with the legislative history and circumstances surrounding the enactment of § 53a-59 (a) (3) for assistance concerning its proper interpretation. The majority in *Miranda I* did not address the legislative history of § 53a-59 (a) (3).

Section 53a-59 was adopted in 1969, after extensive study and debate, as part of the legislature's wholesale revision of our state's criminal law and the adoption of our Penal Code. "The general purpose of the [Penal Code] [was] to create a rational, coherent, cohesive,

substantive criminal law within the state . . . ." Conn. Joint Standing Committee Hearings, Judiciary, 1969 Sess., p. 3, remarks of David Borden, then executive director of the commission to revise the criminal statutes and member of the Connecticut Bar Association's committee on the administration of criminal justice. Considerable debate accompanied the adoption of the Penal Code. Two remarks specifically addressed the assault provision and indicate that legislators contemplated affirmative conduct when enacting the assault statute. During the floor debate in the House of Representatives, Representative John A. Carrozzella, a proponent of the Penal Code, stated: "[A]n assault is an *act* with intent to cause physical injury. You have to have an intent to cause injury." (Emphasis added.) 13 H. R. Proc., Pt. 2, 1969 Sess., p. 962. Borden, one of the drafters of the Penal Code, addressed the assault provisions in his testimony at a public hearing, stating: "The area of assault, the assault crimes are divided into three degrees and they take into account not only *the means used in the assault* but the effect on the victim." (Emphasis added.) Conn. Joint Standing Committee Hearings, supra, p. 6. Both of these remarks support the common understanding of assault in § 53a-59 (a) (3) as requiring affirmative conduct.

Further support for requiring an affirmative act for the commission of an assault is found in the rejection of the American Law Institute's Model Penal Code definition of "conduct" when our Penal Code was drafted. Our Penal Code was drawn from the Model Penal Code and the penal code of other states. Conn. Joint Standing Committee Hearings, supra, p. 11, remarks of Robert Testo, chairperson of the commission to revise the criminal statutes. Section 1.13 (5) of the Model Penal Code specifically defines "conduct" as "an action *or omission* . . . ." (Emphasis added.) Despite the drafters' adoption of many other provisions of the Model Penal Code,

our Penal Code, when enacted in 1969, did not include this important definition of "conduct." I therefore conclude that there is "nothing in the text of § 53a-59 (a) (3), or its legislative history, to support [the] conclusion that conduct under § 53a-59 (a) (3) includes the failure to act." *Miranda I,* supra, 245 Conn. 239 (*Berdon, J.,* dissenting).

The rule of lenity provides further support for construing § 53a-59 (a) (3) to require an affirmative act to constitute an assault. "Special rules govern our review of penal statutes. We have long held that [c]riminal statutes are not to be read more broadly than their language plainly requires . . . . Thus, we begin with the proposition that [c]ourts must avoid imposing criminal liability where the legislature has not expressly so intended . . . and ambiguities are ordinarily to be resolved in favor of the defendant. . . . In other words, penal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create." (Internal quotation marks omitted.) *State* v. *Lutters,* 270 Conn. 198, 206, 853 A.2d 434 (2004); see also *State* v. *Sostre,* 261 Conn. 111, 120, 802 A.2d 754 (2002) ("A penal statute must be construed strictly against the state and liberally in favor of the accused. . . . Criminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant." [Citation omitted; internal quotation marks omitted.]). Construing § 53a-59 (a) (3) strictly in accordance with the rule of lenity, the statute should not be extended by implication to encompass the defendant's failure to act in the present case.

Having forsaken an analysis of the text of § 53a-59 (a) (3) and its legislative history, and having ignored the rule of lenity, the majority opinion in *Miranda I* was based on case law from Connecticut and other jurisdictions. As the defendant in the present case cor-

rectly claims, however, the cases relied upon by the majority in *Miranda I* are largely inapposite. In both Connecticut cases cited by the majority in *Miranda I*, the defendant directly caused serious injury or death to the victim. See *State* v. *Tomassi*, 137 Conn. 113, 75 A.2d 67 (1950) (defendant could be found guilty of either murder or manslaughter, as evidence may prove, for shooting victim with deadly weapon, despite negligent medical care after incident that may have contributed to death); *State* v. *Jones*, 34 Conn. App. 807, 644 A.2d 355 (defendant convicted of first degree assault for violently shaking baby and not seeking help when baby exhibited signs of severe injury), cert. denied, 231 Conn. 909, 648 A.2d 158 (1994). In *Jones*, the defendant's failure to seek help for the victim served as evidence that the defendant exhibited a conscious disregard of a substantial risk of death, but that inaction was not the sole basis for the defendant's conviction. *State* v. *Jones*, supra, 812–13. In *Tomassi*, the court did not consider criminal liability for inaction. Rather, the question before the court was whether the defendant could be held liable for the death of the victim, whom he intentionally had shot, when the direct cause of death was poor medical care. *State* v. *Tomassi*, supra, 119. Thus, any discussion of liability based on omission in either *Tomassi* or *State* v. *Block*, 87 Conn. 573, 576, 89 A. 167 (1913), the case cited in *Tomassi* for the proposition that an act or omission need only be a contributory cause of death, is relevant solely on the question of causation.

The cases from other jurisdictions on which the majority in *Miranda I* relied, and on which the dissent in the present case also relies in part, were dependent on statutes that are not analogous to § 53a-59. In *State* v. *Peters*, 116 Idaho 851, 854, 780 P.2d 602 (1989), the defendant was convicted under Idaho Code § 18-1501 (1), which is not similar to § 53a-59, but more closely

resembles General Statutes § 53-21, our risk of injury statute that criminalizes behavior that places a child in a situation where his life or limb is endangered. In *State v. Williquette*, 129 Wis. 2d 239, 242–43 and n.1, 385 N.W.2d 145 (1986), the defendant was charged and convicted of child abuse under Wisconsin Statutes § 940.201, which covers torture and maltreatment of children. Finally, in *Smith v. State*, 408 N.E.2d 614, 622 (Ind. 1980), the defendant was charged with involuntary manslaughter for the death of her four year old son primarily under Indiana Code § 35-46-1-4, which criminalizes the neglect of a dependent. Although the defendants in *Peters*, *Williquette* and *Smith* had failed to help children who were endangered by others, the statutes under which they were charged directly criminalized inaction as well as action. Thus, these cases are not helpful in deciding the present case, which concerns an assault statute that does *not* specifically criminalize inaction.

The courts in both *People v. Stanciel*, 153 Ill. 2d 218, 222–23, 606 N.E.2d 1201 (1992) (mothers convicted of murder of their children based on their accountability because they knew about and continued to expose children to on-going abuse by their boyfriends), and *State v. Walden*, 306 N.C. 466, 476, 293 S.E.2d 780 (1982) (mother convicted of assault with deadly weapon inflicting serious bodily injury by aiding and abetting because she was present and failed to stop abuse of child by her male companion), affirmed murder and assault convictions, respectively, based on the failure to stop another person's action. In both cases, however, the mothers of the victims were convicted based solely on accessorial liability. In the present case, however, the defendant was found directly liable for assault under § 53a-59 (a) (3), and not as an accessory. Thus, neither *Stanciel* nor *Walden* is relevant to the interpretation

of § 53a-59 (a) (3) as applied to the defendant in the present case.[6]

"The question for this court, in cases such as this, is whether the legislature intended to make the conduct

[6] In her dissent, Justice Katz, the author of the majority opinion in *Miranda I*, relies on several cases from other jurisdictions that were not cited previously in her opinion in *Miranda I*. While these cases might appear similar to the present case at first blush, subtle differences in the pertinent statutory language or the common law of the other state make them inapposite to our analysis of § 53a-59 (a) (3) in the present case. In *Michael* v. *State*, 767 P.2d 193 (Alaska App. 1988), rev'd on other grounds, 805 P.2d 371 (Alaska 1991), the defendant father was convicted of assault in the second degree for failing to protect his child from abuse by the child's mother. The statutory provision under which the defendant in *Michael* was convicted provides in relevant part: "A person commits the crime of assault in the second degree if . . . (2) that person recklessly causes serious physical injury to another person." Alaska Stat. § 11.41.210 (a). The Alaska Court of Appeals' analysis rested largely on a dictionary definition of the term "causes," a term which is not found in § 53a-59 (a) (3). *Michael* v. *State*, supra, 197. Similarly, the defendant in *People* v. *Burden*, 72 Cal. App. 3d 603, 140 Cal. Rptr. 282 (1977), was convicted of murder in the second degree for starving his six month old child and permitting his wife to starve the child. The instruction given to the jury stated that the word "act" under California law includes an omission or failure to act in those situations where a person is under a legal duty to act. Id., 614. This instruction was found to be a correct statement of the law on appeal. Id., 616. Given Connecticut's failure to adopt the definition of "conduct" found in the Model Penal Code, which includes an omission, however, it cannot be said that Connecticut law generally is consistent with California law on this point. In *Degren* v. *State*, 352 Md. 400, 722 A.2d 887 (1999), the defendant was convicted of sexual assault for watching and failing to prevent her husband from sexually assaulting a child in her presence. The sexual assault statute in effect at the time of her conviction prohibited "any *act* that *involves* sexual molestation or exploitation of a child." (Emphasis added.) Md. Code, art. 27, § 35C (a) (6) (i) (1957). The Maryland Court of Appeals affirmed the conviction based in part on the use of the word "involves," a broad term of inclusion that is not employed in § 53a-59 (a) (3). *Degren* v. *State*, supra, 419. In *Smith* v. *State*, 408 N.E.2d 614 (Ind. App. 1980), *Palmer* v. *State*, 223 Md. 341, 164 A.2d 467 (1960), and *State* v. *Mahurin*, 799 S.W.2d 840 (Mo.), cert. denied, 502 U.S. 825, 112 S. Ct. 90, 116 L. Ed. 2d 62 (1990), the defendants were convicted of involuntary manslaughter, a crime that does not require the direct, purposeful action necessary for first degree assault. Finally, in *State* v. *Zobel*, 81 S.D. 260, 134 N.W.2d 101, cert denied, 382 U.S. 833, 86 S. Ct. 74, 15 L. Ed. 2d 76 (1965), the court held that a father's wilful neglect of his children, depriving them of food and medical care, when combined with his failure to protect them

with which the defendant was charged criminal under . . . 53a-59 (a) (3) . . . . It is not whether this court, were it sitting as a legislature, would have proscribed the conduct at issue." *Miranda I*, supra, 245 Conn. 236 (*Berdon, J.*, dissenting). I conclude, based on the all-important text of § 53a-59 (a) (3), and it's accompanying legislative history, and applying the rule of lenity, that the legislature did not intend that inaction, such as the failure to protect a child, should constitute assault under this statute.[7]

The dissenting opinion in the present case by Justice Katz points out that the legislature has had the opportunity to modify § 53a-59 since *Miranda I* was decided to exclude assault by omission if the majority had misinterpreted the statute. The dissent construes the legislature's failure to amend § 53a-59 as an acceptance of this court's interpretation in *Miranda I*. It is true that "we presume that the legislature is aware of our interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." *Ralston Purina* v. *Board of Tax Review*, 203 Conn. 425, 439, 525 A.2d 91 (1987). However, "[w]e have also overruled precedent interpreting a statute even when the legislature has had numerous occasions to reconsider that interpretation and has failed to do so." *Conway* v. *Wilton*, 238 Conn. 653, 662, 680 A.2d 242 (1996). This is one of the rare cases in which it is necessary for this court to reconsider a previous statutory interpretation despite the legislature's inaction.

KATZ, J., dissenting. In *State* v. *Miranda*, 245 Conn. 209, 715 A.2d 680 (1998) (*Miranda I*), the certified ques-

from their mother's beating constituted second degree manslaughter. Under the South Dakota statutory provision then in effect, however, a crime was defined as an act *or omission* forbidden by law. Id., 277; see S.D. Code § 13.0103 (Michie 1939). Connecticut has no similar provision.

[7] The failure to protect a child from physical assault does constitute a crime under the risk of injury statute, § 53-21. The defendant has never challenged his conviction under that statute.

tion before this court was whether the facts and circumstances of this case were sufficient to create a legal duty to protect the victim from parental abuse pursuant to General Statutes § 53a-59 (a) (3). As part of that inquiry, we first examined whether the failure to act can create liability under that statute: "In other words, by failing to act in accordance with a duty, does a defendant commit a crime, such as assault in the first degree in violation of § 53a-59 (a) (3), that is not specifically defined by statute in terms of an omission to act but only in terms of cause and result?" Id., 215. We concluded that, if someone has an undisputed affirmative legal obligation to protect and provide for his minor child, his failure to protect the child from abuse could constitute a violation of § 53a-59 (a) (3). Id., 220–21. We then concluded that the duty to protect could be imposed on the defendant, Santos Miranda, an adult member of the household unrelated to the child. Id., 226. Thereafter, in *State* v. *Miranda*, 260 Conn. 93, 109, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002) (*Miranda II*), we determined that the defendant had fair warning of the consequences of his failure to protect the victim from her mother's abuse because criminal liability under § 53a-59 (a) (3) was neither unexpected nor indefensible by reference to existing common law.

Today, a majority of the court concludes in a per curiam opinion that, despite the legislature's failure to act in response to two en banc decisions by this court, our interpretation of § 53a-59a was incorrect. A plurality of the court, as expressed in a concurring opinion, concludes that, even someone who has an undisputed affirmative legal obligation to protect and provide for a minor child, like a parent, cannot, as a matter of law, commit a violation of § 53a-59 (a) (3) if he or she fails to protect that child from abuse. Another plurality of the court, expressed in a second concurring opinion,

decides that, even if a parent who fails to protect the victim from parental abuse can be liable for a violation of § 53a-59a, the defendant in this case, who considered himself the victim's parent, established a familial relationship with the victim's mother and her children and assumed the role of a father, cannot be held liable. Respectfully, I disagree with my colleagues.

I

I begin with the doctrine of stare decisis, the principle that cautions courts to tread lightly into the world of overruling precedent. "The doctrine [of stare decisis] requires a clear showing that an established rule is incorrect and harmful before it is abandoned"; (internal quotation marks omitted) *White* v. *Burns*, 213 Conn. 307, 335, 567 A.2d 1195 (1990); and "counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Citations omitted; internal quotation marks omitted.) *George* v. *Ericson*, 250 Conn. 312, 318, 736 A.2d 889 (1999).

I recognize that "[s]tare decisis is not an inexorable command. The court must weigh [the] benefits [of stare decisis] against its burdens in deciding whether to overturn a precedent it thinks is unjust. . . . If law is to have a current relevance, courts must have and exert the capacity to change a rule of law when reason so requires." (Citation omitted; internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 660, 680

A.2d 242 (1996). In assessing the force of stare decisis, we must, however, be "especially cautious about overturning a case that concerns statutory construction." (Internal quotation marks omitted.) *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 202, 708 A.2d 1371 (1998).

Today, despite the legislature's failure over the last seven years to respond to this court's interpretation of § 53-59a, a majority of the court determines that our earlier decision was incorrect. "Time and again, [however] we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 297, 695 A.2d 1051 (1997); see, e.g., *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 251–52, 756 A.2d 1264 (2000) (citing principle of stare decisis and relying on legislature's failure to act over six year period as basis for refusing to overrule *Howard* v. *Commissioner of Correction*, 230 Conn. 17, 644 A.2d 874 [1994], in which this court construed calculation of good time credits earned on multiple sentences). Thus, "[w]hile we are aware that legislative inaction is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 262–63, 726 A.2d 531, cert. denied, 528 U.S. 696, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

I consider the legislature's failure to act in the face of our interpretation of § 53a-59 (a) (3) to be highly significant. Although the issue of whether to extend criminal liability to a particular class of persons based on a duty to act was a matter of common-law adjudication, the issue of whether § 53a-59 (a) (3) can be applied to an act of omission as well as commission is a matter of statutory construction. The legislature often has decided to revisit a statute interpreted by this court or to react to a judicial interpretation that the legislature deemed inaccurate.[1] For example in *Bhinder* v. *Sun Co.*, 263 Conn. 358, 374, 819 A.2d 822 (2003), we recognized that the legislature, in response to our prior decision in that wrongful death case permitting common-

[1] Indeed, the plethora of cases in which we have noted that the legislature has enacted legislation in response to one of our decisions lends strong support to the proposition that the legislature will not hesitate to take action when it views our decisions as misconstruing its intent. See, e.g., *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 727–28, 780 A.2d 1 (2001) (determining that legislature had enacted Public Act 00-206, § 1 (g), in reaction to our decision in *Christian Activities Council, Congregational* v. *Town Council*, 249 Conn. 566, 589, 735 A.2d 231 [1999]); *Greenwich Hospital* v. *Gavin*, 265 Conn. 511, 514 n.3, 829 A.2d 810 (2003) (stating that "[General Statutes §] 12-263b, the gross earnings statute, was enacted by the General Assembly as an emergency certified bill in response to the decision in *New England Health Care Employees Union District 1199, SEIU AFL-CIO* v. *Mount Sinai Hospital*, 846 F. Sup. 190, 195–200 [D.Conn. 1994], rev'd, 65 F.3d 1024 [2d Cir. 1995]"); *In re Michael S.*, 258 Conn. 621, 629, 784 A.2d 317 (2001) (concluding that No. 86-185, § 2, of 1986 Public Acts was enacted to overrule our decision in *In re Juvenile Appeal [85-AB]*, 195 Conn. 303, 488 A.2d 778 [1985]); *King* v. *Sultar*, 253 Conn. 429, 442, 754 A.2d 782 (2000) ("legislative history of . . . the bill eventually enacted as Public Acts 1971, No. 524, § 1, and codified at [General Statutes] § 7-433c, clearly and unequivocally demonstrates that the legislature enacted § 7-433c in direct response to our decision in *Ducharme* [v. *Putnam*, 161 Conn. 135, 285 A.2d 318 (1971)]); *Colonial Penn Ins. Co.* v. *Bryant*, 245 Conn. 710, 720 n.17, 714 A.2d 1209 (1998) (stating that General Statutes § 38a-336 [f] "was enacted in response to our decision in *CNA Ins. Co.* v. *Colman*, 222 Conn. 769, 610 A.2d 1257 [1992]"); *Federal Deposit Ins. Corp.* v. *Hillcrest Associates*, 233 Conn. 153, 167–68, 659 A.2d 138 (1995) (concluding that legislature amended statute "in response to our decision in *Dime Savings Bank* [v. *Pomeranz*, 123 Conn. 581, 196 A. 634 (1938)]").

law apportionment of damages to a third party who acted intentionally or recklessly; see *Bhinder* v. *Sun Co.*, 246 Conn. 223, 242, 717 A.2d 202 (1998); had enacted a statute precluding apportionment between parties on any basis other than negligence. As a result, we reversed our original decision in *Bhinder* in light of that clarifying legislation, stating: "[W]e have often held . . . that it is as much within the legislative power as the judicial power—subject, of course, to constitutional limits other than the separation of powers—for the legislature to declare what its intent was in enacting previous legislation." (Internal quotation marks omitted.) *Bhinder* v. *Sun Co.*, supra, 263 Conn. 372. Thus, it is clear that "[t]he legislature has the power to make evident to us that it never intended to provide a litigant with the rights that we had previously interpreted a statute to confer." *State* v. *Blasko*, 202 Conn. 541, 558, 522 A.2d 753 (1987). Implicit in our decisions recognizing the legislature's authority to clarify its intent by subsequent legislation was the recognition that pending cases, even those that provided the impetus for the clarifying legislation, could be affected. *Greenwich Hospital* v. *Gavin*, 265 Conn. 511, 520, 829 A.2d 810 (2003); see, e.g., *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 692–94, 755 A.2d 850 (2000) (recognizing that legislature had enacted legislation during judicial proceedings of case to clarify statutory scheme as result of improper construction by trial court and applying legislation retroactively); *State* v. *Magnano*, 204 Conn. 259, 273, 528 A.2d 760 (1987) (same); see also *Andersen Consulting, LLP* v. *Gavin*, 255 Conn. 498, 517, 767 A.2d 692 (2001) (recognizing retroactive effect of clarifying legislation).

Accordingly, it is clear that the legislature had the authority to make it evident that it never intended to punish someone under § 53a-59 (a) (3) for his failure to act or to prevent harm, after either the *Miranda I*

or *Miranda II* decision. Its failure to respond to either of these decisions involving this defendant strongly suggests that our initial determination was proper.

## II

I next question the wisdom of revisiting the issue in this case. I recognize the fairness exercised when a court, which decides that an earlier interpretation of a statute was incorrect, affords the benefit of that determination to the defendant who was harmed by the earlier ruling. There is, however, an issue of finality of judgments, a consideration that questions whether it is judicious for the court to revisit issues previously decided against a litigant. "[T]he doctrine of res judicata, or claim preclusion, [provides that] a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action [between the same parties or those in privity with them] on the same claim." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, 238 Conn. 183, 191, 680 A.2d 1243 (1996). "The [doctrine] . . . [is] based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. . . . [W]here a party has fully and fairly litigated his claims, he may be barred from future actions on matters not raised in the prior proceeding."[2] (Internal quotation marks omitted.) Id., 192–93.

---

[2] The presumption of finality of judgments is also underscored by the law of the case doctrine, which "expresses the practice of judges generally to refuse to reopen what has been decided . . . ." (Internal quotation marks omitted.) *Suffield Bank* v. *Berman*, 228 Conn. 766, 774–75, 639 A.2d 1033 (1994). We have applied the law of the case doctrine in criminal cases to preclude defendants from relitigating claims decided in earlier appeals of the same case. See, e.g., *State* v. *Ross*, 269 Conn. 213, 263, 849 A.2d 648 (2004) ("The defendant now claims that the trial court's denial of his motion to sever the cases prior to the second penalty phase was improper . . . [on three grounds]. These are precisely the same issues, however, as the issues raised by the defendant before the first guilt phase and reviewed by this court in [the defendant's previous appeal from the imposition of the death penalty, *State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995)]. Accordingly,

The doctrine of res judicata applies to criminal as well as civil proceedings and to state habeas corpus proceedings. *McCarthy* v. *Warden*, 213 Conn. 289, 294–98, 567 A.2d 1187 (1989), cert. denied, 496 U.S. 939, 110 S. Ct. 3220, 110 L. Ed. 2d 667 (1990). In the context of habeas proceedings, however, we have recognized that, "[a]lthough the doctrine of res judicata in its fullest sense bars claims that could have been raised in a prior proceeding, such an application in the habeas corpus context would be unduly harsh. . . . Unique policy considerations must be taken into account in applying the doctrine of res judicata to a constitutional claim raised by a habeas petitioner. . . . Foremost among those considerations is the interest in making certain that no one is deprived of liberty in violation of his or her constitutional rights. . . . With that in mind, we limit the application of the doctrine of res judicata in circumstances such as these to claims that actually have been raised and litigated in an earlier proceeding." (Citations omitted; internal quotation marks omitted.) *Thorpe* v. *Commissioner of Correction*, 73 Conn. App. 773, 778–79 n.7, 809 A.2d 1126 (2002); see, e.g, *Asherman* v. *State*, 202 Conn. 429, 443, 521 A.2d 578 (1987) (concluding that defendant's claim of juror misconduct was barred by res judicata because claim was identical to claim previously raised and decided).

There is no doubt that the issue in this appeal is the same issue that was raised by the defendant and decided against him by this court in the defendant's first challenge to his conviction, *Miranda I.* The only question then is whether the circumstances warrant a deviation from our well settled doctrine. I am not persuaded. As I explain more fully in part III of this opinion, the catalyst for our reconsideration of the defendant's assault convictions is the severity of the sentence imposed.

we conclude that this claim is governed by the law of the case and that the trial court properly denied the motion to sever.").

The majority does not proclaim the defendant innocent of all wrongdoing. In other words, this is not a case in which the court concludes that what was once deemed to have been criminal behavior is now innocent. On the contrary, the court, as well as the defendant, acknowledges that his conviction for risk of injury was proper.[3] The issue is whether the defendant properly was charged. Had his sentence of incarceration been for concurrent time, there would have been no point from a practical standpoint nor, I venture to guess, interest from a legal stance in revisiting this issue. Thus, the doctrine of res judicata presents a paramount consideration that should not be driven by sentencing considerations.

## III

Turning to the merits of the inquiry, I continue to believe that the defendant in this case properly was convicted of assault in the first degree in violation of § 53a-59 (a) (3) because he recklessly engaged in conduct thereby causing serious physical injury in that he failed to act, help or aid the child victim by promptly notifying authorities of her injuries, taking her for medical care, removing her from her circumstances and guarding her from future abuses. As a result of his failure to help her, the child was exposed to conduct that created a risk of death to her, and the child suffered subsequent serious physical injuries. This court set forth the facts the trial court reasonably had found in *Miranda I,* supra, 245 Conn. 212–14. As best as I can determine, nothing has changed in this regard.

"The defendant commenced living with his girlfriend and her two children in an apartment [in Meriden] in

---

[3] Indeed, I am puzzled by the characterization of the language in § 53a-59 (a) (3) by Justice Vertefeuille in her concurrence as "affirmative" when the risk of injury statute, General Statutes § 53-21, which indisputably applies to the defendant's failure to act in this case, uses language—"causes or permits" and "does any act"—that could be labeled similarly.

September, 1992. On January 27, 1993, the defendant was twenty-one years old, his girlfriend was sixteen, her son was two, and her daughter, the victim in this case, born on September 21, 1992, was four months old. Although he was not the biological father of either child, the defendant took care of them and considered himself to be their stepfather. He represented himself as such to the people at Meriden Veteran's Memorial Hospital where, on January 27, 1993, the victim was taken for treatment of her injuries following a 911 call by the defendant that the child was choking on milk. Upon examination at the hospital, it was determined that the victim had multiple rib fractures that were approximately two to three weeks old, two skull fractures that were approximately seven to ten days old, a brachial plexus injury to her left arm, a rectal tear that was actively 'oozing blood' and bilateral subconjunctival nasal hemorrhages. On the basis of extensive medical evidence, the trial court determined that the injuries had been sustained on three or more occasions and that none of the injuries had been the result of an accident, a fall, events that took place at the time of the child's birth, cardiopulmonary resuscitation, a blocked air passageway or the child choking on milk. Rather, the trial court found that the injuries, many of which created a risk of death, had been caused by great and deliberate force.

"The trial court further found in accordance with the medical evidence that, as a result of the nature of these injuries, at the time they were sustained the victim would have screamed inconsolably, and that her injuries would have caused noticeable physical deformities, such as swelling, bruising and poor mobility, and finally, that her intake of food would have been reduced. The court also determined that anyone who saw the child would have had to notice these injuries, the consequent deformities and her reactions. Indeed, the trial court

found that the defendant had been aware of the various bruises on her right cheek and the subconjunctival nasal hemorrhages, as well as the swelling of the child's head, that he knew she had suffered a rectal tear, as well as rib fractures posteriorly on the left and right sides, and that he was aware that there existed a substantial and unjustifiable risk that the child was exposed to conduct that created a risk of death. The trial court concluded that despite this knowledge, the defendant 'failed to act to help or aid [the child] by promptly notifying authorities of her injuries, taking her for medical care, removing her from her circumstances and guarding her from future abuses. As a result of his failure to help her, the child was exposed to conduct which created a risk of death to her and the child suffered subsequent serious physical injuries . . . ." Id.

On the basis of the foregoing facts, as reasonably found by the trial court, in *Miranda I*, this court engaged in our traditional process to determine whether the defendant's conduct constituted a violation of § 53a-59 (a) (3). Indeed, in *Miranda II*, supra, 260 Conn. 106–109, in deciding whether this court's application of § 53a-59 (a) (3) in *Miranda I* to the defendant was reasonably foreseeable, we recognized as follows the well reasoned process that we previously had employed in making that initial determination.

"[In *Miranda I*] we employed the ordinary tools of statutory construction.[4] We examined the plain language of § 53a-59 (a) (3), the text of our statutes, the common law of our state and other jurisdictions, other Connecticut statutes governing similar conduct, and

[4] I find it curious that, despite this express recognition in the majority opinion in *Miranda II*, supra, 260 Conn. 106, which Justice Vertefeuille authored, that we previously had applied our traditional tools of statutory construction, the concurring opinion by Justice Vertefeuille in this appeal nevertheless states that the *Miranda I* majority failed to engage in any analysis of § 53a-59 (a) (3).

treatises addressing this issue. These ordinary tools of statutory construction enabled us to conclude that under the facts of this case, it is appropriate to recognize an affirmative duty to act and to impose criminal liability for the failure to act pursuant to that duty. *Miranda I*, supra, 245 Conn. 221.

"First, the court examined the plain language of § 53a-59 (a) (3) and the text of our statutes. We determined that the plain language of § 53a-59 (a) (3) [does not] preclude criminal liability from attaching to an omission to act when a legal duty to act exists and injury results.[5]

---

[5] I would suggest that any claim that "inaction" cannot constitute "conduct" within § 53a-59 (a) (3), "can be dismissed with little discussion. We approved the principle long ago that a cause of death sufficient to establish criminal liability could be an act, or omission to act. *State* v. *Tomassi*, 137 Conn. 113, 119, 75 A.2d 67 [1950]; see Perkins, Criminal Law (2d Ed.), Causation, § 9, pp. 732 et seq." *State* v. *Spates*, 176 Conn. 227, 232 n.3, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979) (making statement in connection with interpretation of General Statutes § 53a-55 [a] [3]).

It also is significant that, as we noted in our maiden voyage into this case, "[i]n recognition of the broad term 'engage in conduct,' as chosen by the legislature in § 53a-59 (a) (3), suggesting at least the want of due care, the failure to respond and the disregard of responsibility, the defendant does not claim that the plain language of the statute precludes criminal liability from attaching to an omission to act when there is a legal duty to do so. Nor does the defendant challenge the long-standing and fundamental principle that 'conduct' can include the failure to act when there is a duty to act. 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.3 (a)." *Miranda I*, supra, 245 Conn. 215 n.8.

Finally, I note that the legislative history referenced by Justice Vertefeuille's concurring opinion sheds no light on this issue. As Justice Vertefeuille notes, Robert Testo, then chairperson of the commission to revise the criminal statutes (commission), stated in testimony before the judiciary committee that the commission had looked at the American Law Institute's Model Penal Code, as well as New York's Penal Code, when drafting the 1969 Penal Code. Conn. Joint Standing Committee Hearings, Judiciary, 1969 Sess., p. 11. The remarks to which she refers, however, were addressed to the Penal Code generally and not to any particular statute or term. Thus, in the absence of any specific discussion on the commission's adoption or rejection of any model code provision in connection with its discussion of § 53a-59 or any other specific provision that bears on the issue before us, I draw no significance from the drafters' failure to adopt a particular definition of the term "conduct."

Id., 220–21. In addition, many statutes that expressly impose a legal duty to act and attach liability for failure to comply with that duty and other statutes impose liability for failure to comply with a duty found either in a separate statute or in the common law. Id., 219. We also concluded that our Penal Code did not foreclose the possibility of a duty and criminal liability for the breach of that duty existing under the facts of this case.[6] Id., 219–20. We concluded that the text of § 53a-

---

[6] Specifically, in *Miranda I*, supra, 245 Conn. 219–20, we turned to, inter alia, General Statutes § 53a-4 ("[t]he provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions" [internal quotation marks omitted]), as well as the official commentary to that provision. Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes Annotated (West 1985) § 53a-4, p. 196 ("The purpose of this savings clause is to make clear that the provisions of [General Statutes §§] 53a-5 to 53a-23, which define the principles of criminal liability and defenses, are not necessarily exclusive. A court is not precluded by sections 53a-5 to 53a-23 from recognizing other such principles and defenses not inconsistent therewith."). This court's opinion in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993), exemplifies our approach to interpreting § 53a-4 in light of certain common-law principles of criminal liability. In *Walton*, we adopted the *Pinkerton* principle of liability—that is, "a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." Id., 43, citing *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). As we explained, we were "not fashion[ing] an additional substantive offense by applying *Pinkerton* to the facts of [*Walton*] . . . [because the] *Pinkerton* principle does not create a substantive offense; it applies a particular principle of vicarious criminal liability to an appropriate case." *State* v. *Walton*, supra, 45 n.11.

I am mindful that the commentary to § 53a-4 sets certain limits to our authority by providing: "This does not mean, however, that the court is free to fashion additional substantive offenses, for the [Penal Code] precludes, by repealing [General Statutes §] 54-117, the notion of common law crimes." Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes Annotated (West 1994) § 53a-4, p. 223. As this dissent makes clear, however, I do not believe that in *Miranda I*, supra, 245 Conn. 209, the court created an additional substantive offense by holding the defendant in this case accountable. In other words, the edict against creating common-law crimes was not violated. Failure to act when there is a special relationship does not, by itself, constitute a crime. The failure

59 (a) (3) and other statutes did not prevent us from recognizing that, under the facts of this case, the defendant had a common-law duty to act and his failure to do so exposed him to criminal liability under § 53a-59 (a) (3). Id., 220–21.

"Second, we examined the common law in Connecticut and other jurisdictions. Common law courts frequently look to the decisions of other jurisdictions in determining whether to alter or modify a common law rule in light of changed circumstances, increased knowledge, and general logic and experience. *Rogers* v. *Tennessee*, [532 U.S. 451, 464, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001)]. In addition, although due process does not require that a person know the common law of every jurisdiction, an examination of the common law of other jurisdictions is surely relevant to whether [a change in common law] . . . in a particular case can be said to be unexpected and indefensible by reference to the law as it then existed. Id. We concluded that [i]t is undisputed that parents have a duty to provide food, shelter and medical aid for their children and to protect them from harm under the common law of Connecticut and other jurisdictions.[7] [*Miranda I*],

must expose the dependent person to some proscribed result. The definition of proscribed results constitutes the substantive crime, and those results are defined in the Penal Code.

[7] As we explained in *Miranda I*, "[i]t is undisputed that parents have a duty to provide food, shelter and medical aid for their children and to protect them from harm. See *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 15, 438 A.2d 801 (1981). The inherent dependency of a child upon his parent to obtain medical aid, i.e., the incapacity of a child to evaluate his condition and summon aid by himself, supports imposition of such a duty upon the parent. *Commonwealth* v. *Konz*, 498 Pa. 639, 644, 450 A.2d 638 (1982). Additionally, [t]he commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. *In re Adoption of Webb*, 14 Wash. App. 651, 653, 544 P.2d 130 (1975). Indeed, the status relationship giving rise to a duty to provide and protect that has been before the

supra, 245 Conn. 222. In looking at the common law of other jurisdictions, we also found that some jurisdictions have imposed a duty to protect a child from harm on adult individuals, other than parents, who establish familial relationships and assume responsibility for the care of a child.[8] Id., 223.

courts more often than any other relationship and, at the same time, the one relationship that courts most frequently assume to exist without expressly so stating, is the relationship existing between a parent and a minor child." (Internal quotation marks omitted.) *Miranda I*, supra, 245 Conn. 222. Consequently, criminal liability of parents based on a failure to act in accordance with common-law affirmative duties to protect and care for their children is well recognized in many jurisdictions. See footnote 8 of this opinion.

[8] Although we did not state the point expressly in *Miranda I*, it is clear that imposing such a duty on adults other than parents necessarily would impose a similar duty on parents to protect a child from harm. I note that, although there does not appear to be extensive law directly on point, the case law that is available appears to be unanimous in establishing a duty of a parent to act to protect his or her child, the breach of which will give rise to liability for, inter alia, abuse, manslaughter and assault. See, e.g., *Michael* v. *State*, 767 P.2d 193 (Alaska App. 1988) (father held criminally responsible for reckless assault for failure to protect child from mother's abuse), rev'd on other grounds, 805 P.2d 371 (Alaska 1991); *People* v. *Burden*, 72 Cal. App. 3d 603, 140 Cal. Rptr. 282 (1977) (father convicted of second degree murder for failure to feed his child after child died of malnutrition and dehydration); *People* v. *Stanciel*, 153 Ill. 2d 218, 606 N.E.2d 1201 (1992) (mothers guilty of homicide by allowing their abusive companions to retain role of disciplinarian over their children); *Smith* v. *State*, 408 N.E.2d 614 (Ind. App. 1980) (mother held criminally responsible for failing to prevent fatal beating of child by her lover), overruled on other grounds, *Armour* v. *State*, 479 N.E.2d 1294 (Ind. 1985); *Palmer v. State*, 223 Md. 341, 164 A.2d 467 (1960) (affirming mother's conviction of involuntary manslaughter based on her failure to protect her infant daughter from repeated abuse by her boyfriend); *State v. Walden*, 306 N.C. 466, 476, 293 S.E.2d 780 (1982) ("the failure of a parent who is present to take all steps reasonably possible to protect the parent's child from an attack by another person constitutes an act of omission by the parent showing the parent's consent and contribution to the crime being committed"); *State v. Zobel*, 81 S.D. 260, 134 N.W.2d 101 (parents convicted of murder for neglect of children that resulted in death), cert. denied, 382 U.S. 833, 86 S. Ct. 74, 15 L. Ed. 2d 76 (1965), overruled on other grounds, *State* v. *Waff*, 373 N.W.2d 18 (S.D. 1985); *State v. Williquette*, 129 Wis. 2d 239, 385 N.W.2d 145 (1986) (concluding that mother's failure to prevent father's abuse of their children by leaving them in his care when she knew he regularly abused them physically and sexually constituted child abuse under language of statute); see also *State* v. *Peters*, 116 Idaho 851,

"We analyzed four cases from other jurisdictions[9] with facts similar to the present case. In examining those cases, we deduced that these courts [in other jurisdictions] have examined the nature of the relationship of the defendant to the victim and whether the defendant, as part of that relationship, had assumed a responsibility for the victim to determine whether the defendant had a duty to act under the particular circumstances of each case. Id. We found the reliance by these courts on this combination of factors persuasive. Id. Using this same combination of factors, we determined in the present case that when the defendant, who considered himself the victim's parent, established a familial relationship with the victim's mother and her children and assumed the role of a father, he assumed, under the common law, the same legal duty to protect the victim from the abuse as if he were, in fact, the victim's guardian. Id., 226. An examination of the common law of other states indicated that it was not unexpected and indefensible to impose a common-law duty on the defendant to protect the victim under the facts of this case. See *Rogers* v. *Tennessee*, supra, 532 U.S. 464.

"Third, we examined other Connecticut statutes governing conduct similar to that at issue in the present case. We looked to other relevant statutes governing the same or similar subject matter because the legislature is presumed to have created a consistent body of law. [*Miranda I*], supra, 245 Conn. 229, citing *Daly* v. *Del-*

855, 780 P.2d 602 (App. 1989) (noting that parent has duty to protect and care for child and when injury results from failure to protect child from harm, failure to act will be "deemed to be the cause of those injuries").

[9] "*Leet* v. *State*, 595 So. 2d 959 (Fla. App. 1991); *State* v. *Orosco*, 113 N.M. 789, 833 P.2d 1155 (1991) [aff'd, 113 N.M. 780, 833 P.2d 1146 (1992)]; *People* v. *Wong*, 182 App. Div. 2d 98, 588 N.Y.S.2d 119, rev'd on other grounds, 81 N.Y.2d 600, 619 N.E.2d 600, 601 N.Y.S.2d 440 (1993); *People* v. *Salley*, 153 App. Div. 2d 704, 544 N.Y.S.2d 680 (1989) [appeal denied, 75 N.Y.2d 817, 551 N.E.2d 1245, 552 N.Y.S.2d 567 (1990)]." *Miranda II*, supra, 260 Conn. 108 n.9.

*Ponte*, 225 Conn. 499, 510, 624 A.2d 876 (1993). We concluded, therefore, that because § 53-21 [the risk of injury statute], without any explicit restriction, holds responsible *any* person who permits abuse of a child to occur, to prescribe a duty in connection with § 53a-59 (a) (3) to prevent such abuse furthers a harmonious and consistent body of law . . . .[10] [*Miranda I*], supra, 245 Conn. 230.

---

[10] I would note that our initial determination in *Miranda I* is consistent with the aim, purpose and policy behind numerous *other* statutes addressing family violence and child abuse. See, e.g., General Statutes §§ 46b-38a, 17a-101 and 17a-103.

General Statutes § 46b-38a, which sets forth definitions related to family violence prevention and response, provides in relevant part: "For the purposes of sections 46b-38a to 46b-38f, inclusive:

"(1) 'Family violence' means an incident resulting in physical harm, bodily injury or assault, or an act of threatened violence that constitutes fear of imminent physical harm, bodily injury or assault between family or household members. Verbal abuse or argument shall not constitute family violence unless there is present danger and the likelihood that physical violence will occur.

"(2) 'Family or household member' means (A) spouses, former spouses; (B) parents and their children; (C) persons eighteen years of age or older related by blood or marriage; (D) persons sixteen years of age or older other than those persons in subparagraph (C) presently residing together or who have resided together; (E) persons who have a child in common regardless of whether they are or have been married or have lived together at any time; and (f) persons in, or have recently been in, a dating relationship.

"(3) 'Family violence crime' means a crime as defined in section 53a-24 which, in addition to its other elements, contains as an element thereof an act of family violence to a family member and shall not include acts by parents or guardians disciplining minor children unless such acts constitute abuse. . . . "

General Statutes § 17a-101 (a) provides: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family."

General Statutes § 17a-103 (a) provides in relevant part: "Any . . . person having reasonable cause to suspect or believe that any child under the age of eighteen is in danger of being abused, or has been abused or neglected, as defined in section 46b-120, may cause a written or oral report to be made to the Commissioner of Children and Families or his representative or a

"We also reviewed treatises, which demonstrated that the trend of Anglo-American law has been toward enlarging the scope of criminal liability for failure to act in those situations in which the common law or statutes have imposed an affirmative responsibility for the safety and well-being of others.[11] Id., 215, citing 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.3; annot., 61 A.L.R.3d 1207 (1975); annot., 100 A.L.R.2d 483 (1965). As Professors Wayne LaFave and Austin Scott stated in their treatise, if two people, though not closely related, live together under one roof, one may have a duty to act to aid the other who becomes helpless. 1 W. LaFave & A. Scott, supra, § 3.3 (a), p. 286."[12] (Internal quotation marks omitted.) *Miranda II*, supra, 260 Conn. 106-109.

"We conclude[d] [therefore] that our recognition of a common-law duty that required the defendant either to take affirmative action to prevent harm to the victim or be exposed to criminal liability under § 53a-59 (a) (3) was not unexpected and indefensible by reference

law enforcement agency. The Commissioner of Children and Families or his representative shall use his best efforts to obtain the name and address of a person who causes a report to be made pursuant to this section. . . ."

[11] Specifically, in *Miranda I*, supra, 245 Conn. 221, we noted "four widely recognized situations in which the failure to act may constitute breach of a legal duty: (1) where one stands in a certain relationship to another; (2) where a statute imposes a duty to help another; (3) where one has assumed a contractual duty; and (4) where one voluntarily has assumed the care of another. 1 W. LaFave & A. Scott, supra, § 3.3 (a) (1) [through] (4), pp. 284–87."

[12] As we stated in *Miranda I*, supra, 245 Conn. 223, "[r]ecognizing the primary responsibility of a natural parent does not mean that an unrelated person may not also have some responsibilities incident to the care and custody of a child. Such duties may be regarded as derived from the primary custodian, i.e., the natural parent, or arise from the nature of the circumstances. *People* v. *Berg*, 171 Ill. App. 3d 316, 320, 525 N.E.2d 573 (1988) [(concluding that, although defendant had duty as any person under child endangerment statute based upon evidence that he lived with victim and her mother, would play with victim, feed and clothe her, discipline her and take her places, under circumstances of case there was insufficient evidence that defendant had endangered victim's health by not obtaining medical treatment)] . . . ." (Citation omitted; internal quotation marks omitted.)

to the law which had been expressed prior to the conduct in issue. *Rogers* v. *Tennessee,* supra, 532 U.S. 461, quoting *Bouie* v. *Columbia,* [378 U.S. 347, 354, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964)]. To reach the conclusion that we did, we relied on ordinary tools of statutory construction. Those tools of statutory construction demonstrated that by reference to the law as it then existed, it was neither unexpected nor indefensible to impose a common-law duty on the defendant to protect the victim under the facts of this case and to impose criminal liability for his failure to so act. [Accordingly, we concluded] . . . that this court's recognition of a common-law duty and the application of § 53a-59 (a) (3) were reasonably foreseeable and did not deprive the defendant of due process in accordance with the standard articulated in *Bouie.*" (Internal quotation marks omitted.) *Miranda II,* supra, 260 Conn. 109–10.

Today, despite the fact that in *Miranda II,* the court essentially reinforced the reasoning that informed the first case involving this defendant, the majority of the court changes its opinion—a plurality determines that even a parent cannot be held liable for reckless assault under § 53a-59 (a) (3) for failing to prevent abuse of his or her own child, as discussed in Justice Vertefeuille's concurrence, and another plurality determines that, even if the assault statute contemplates omission by someone with a duty to act, the defendant does not fall within that category under the facts of this case, as discussed in Justice Borden's concurrence. I continue to abide by our earlier recognition that an omission to act may create criminal culpability under our Penal Code even though the law defining the offense, as here, provides that the defendant must have "engage[d] in conduct which create[d] a risk of death to another person, and thereby cause[d] serious physical

injury . . . ."[13] General Statutes § 53a-59 (a) (3).

[13] Although some of the cases referenced in this dissent involve offenses that do not incorporate the exact terminology of § 53a-59 (a), others come very close. For example, in *Michael* v. *State*, 767 P.2d 193, 197, (Alaska App. 1988), rev'd on other grounds 805 P.2d 371 (Alaska 1991), the Alaska Court of Appeals considered the defendant's conviction of assault in the second degree, which was statutorily defined as "recklessly *caus[ing]* serious physical injury to another person. [Alaska Stat. § 11.41.210 (a) (2).]" (Emphasis in original.) The question before the court was whether the defendant properly could be said to have caused the injuries to the minor child in that case if he recklessly had failed to act to protect her. *Michael* v. *State*, supra, 197. The assault statute did not define when a person can be said to have caused an injury to another, so the court first turned to the dictionary as a source to determine what the legislature intended in using the word "caused." Id. The court noted that, "Webster's New Collegiate Dictionary defines 'cause' as 'a: something that brings about an effect or a result b: a person or thing *that is the occasion of an action or state, esp. an agent that brings something* about c: a reason for an action or condition.' " *Michael* v. *State*, supra, 197. Concluding that a result of the defendant's failure to intervene to prevent the injuries was that the child received further injuries, the court determined that the plain wording of the statute provided that the defendant's failure to take reasonable actions to protect his child from serious physical injury "caused" the injuries. Id. Additionally, the court was unimpressed with the defendant's *contention that the state improperly had charged him with* assault when two other statutes, "reckless endangerment," and "endangering the welfare of a minor," more closely fit the crime with which he was charged. Id., 200–201.

Similarly, in *Degren* v. *State*, supra, 352 Md. 404, the Maryland Court of Appeals considered whether a person with responsibility for a minor child who fails to prevent that child from being raped while the child is in her presence could be convicted of sexual abuse. The court examined article 27, § 35C (b) (1) of the Maryland Code, which provides that "[a] parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a child . . . who causes abuse to the child is guilty of a felony . . . ." Abuse under the Maryland Code includes both "[t]he sustaining of physical injury by a child as a result of cruel or inhumane treatment or as a result of a malicious act . . . under circumstances that indicate that the child's health or welfare is harmed or threatened thereby." Md. Code, art. 27, § 35C (a) (2) (i) (1957). Sexual abuse is defined as "any act that involves sexual molestation or exploitation of a child." Md. Code, art. 27, § 35C (a) (6) (i) (1957). In affirming the trial court's judgment, the Court of Appeals rejected the petitioner's argument that, because the plain meaning of the word "act" as used in § 35C (a) (6) (i) denotes an affirmative act as opposed to an omission, she could not be held criminally liable for the sexual abuse of the child because her omission or failure to prevent another person's *act of sexual molestation or exploitation is not punishable* under the statute. *Degren* v. *State*, supra, 420–21.

Indeed, I venture to guess that a majority of this court would acknowledge that, if a mother, who did not her-

Even in the cases involving statutes that resemble our aiding and abetting statute, General Statutes § 53a-8, the courts did not focus on whether the defendants actually had aided the principals in the pattern of abuse resulting in the death of the children, but relied instead on their affirmative duty to protect their children from the threat posed by others and *their failure to act*. For example, in *People* v. *Stanciel*, 153 Ill.2d 232–33, 606 N.E.2d 1201 (1992), the Illinois Supreme Court decided that, despite the existence of the term "commission" in the criminal accountability statute then in effect; see Ill. Rev. Stat. c. 38, para. 5-2 (1987) ("[a] person is legally accountable for the conduct of another when . . . (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense"); the mothers' convictions of homicide properly were based on the result of an *omission* by someone with a duty to protect. *People* v. *Stanciel*, supra, 235–37.

Finally, even with regard to the cases Justice Vertefeuille attempts to distinguish by stating that the statutes involved therein "directly criminalized inaction as well as action," a characterization with which I strongly disagree, those courts did not rely solely on a narrow interpretation of one word. For example, in *State* v. *Williquette*, 129 Wis. 2d 239, 250–54, 385 N.W.2d 145 (1986), the Wisconsin Supreme Court concluded that the ordinary and accepted meaning of the term "subjects" under the child abuse statute; Wis. Stat. § 940.201; is not limited to persons who actively participate in abusing children. Linking a duty to act to the concept of proximate cause to find the defendant guilty by omission, the court reasoned: "[Section § 940.201] covers situations in which a person with a duty toward a child exposes the child to a foreseeable risk of abuse. . . . A person exposes a child to abuse when he or she causes the child to come within the influence of a foreseeable risk of cruel maltreatment. Causation in this context means that a person's conduct is a substantial factor in exposing the child to risk, and there may be more than one substantial causative factor in any given case. . . . [T]he defendant's alleged conduct, as the mother of the children, also was a contributing cause of risk to the children. She allegedly knew that the father abused the children in her absence, but she continued to leave the children and to entrust them to his exclusive care, and she allegedly did nothing else to prevent the abuse, such as notifying proper authorities or providing alternative child care in her absence. We conclude that the defendant's conduct, as alleged, constituted a substantial factor which increased the risk of further abuse." (Citations omitted.) *State* v. *Williquette*, supra, 249–50. In reaching its decision, the Wisconsin Supreme Court expressly rejected the defendant's claim that an act of commission, rather than omission, is a necessary element of a crime, stating: "The essence of criminal conduct is the requirement of a wrongful act. . . . This element, however, is satisfied by overt acts, as well as omissions to act where there is a legal duty to act. . . . [T]he general rule applicable to omissions . . . [is that] [s]ome statutory crimes are specifically defined in terms of omission to act. With other

self inflict any punishment on her child, but allowed her boyfriend to inflict brutal beatings that caused serious physical injury to her infant, were charged with reckless assault, she should be treated no differently than if she had allowed her child to starve nearly to death or wander into traffic and be hit by a vehicle. In either instance, she would have engaged in conduct that constituted a gross deviation from the standard of conduct that any reasonable parent would observe under the circumstances.[14] In either instance, the injury caused by the mother's conduct would have been a foreseeable and natural result of her conduct, thereby making her criminally responsible. See *State* v. *Spates*, 176 Conn. 227, 233–35, 405 A.2d 656 (1978), cert. denied, 440 U.S.

common law and statutory crimes which are defined in terms of conduct producing a specified result, a person may be criminally liable when his omission to act produces that result, but only if (1) he has, under the circumstances, a legal duty to act, and (2) he can physically perform the act. . . . [S]ome criminal statutes themselves impose the legal duty to act, as with the tax statute and the hit-and-run statute. With other crimes the duty must be found outside the definition of the crime itself—perhaps in another statute, or in the common law, or in a contract. . . . The requirement of a legal duty to act is a policy limitation which prevents most omissions from being considered the proximate cause of a prohibited consequence. In a technical sense, a person's omission, i.e., whether the person fails to protect, warn or rescue, may be a substantial factor in exposing another person to harm. The concept of causation, however, is not solely a question of mechanical connection between events, but also a question of policy. . . . The rule that persons do not have a general duty to protect represents a public policy choice to limit criminal liability. The requirement of an overt act, therefore, is not inherently necessary for criminal liability. Criminal liability depends on conduct which is a substantial factor in producing consequences. Omissions are as capable of producing consequences as overt acts." (Citations omitted; internal quotation marks omitted.) Id., 251–53.

[14] For example, in *State* v. *Mahurin*, 799 S.W.2d 840, 844 (Mo.), cert. denied, 502 U.S. 825, 112 S. Ct. 90, 116 L. Ed. 2d 62 (1990), the defendant parents, despite instructions by health care professionals on proper infant care upon discharge from the hospital after the birth of their twin boys, failed to properly feed the boys, resulting in the death of one of the children. The receipt of those instructions led the Missouri Supreme Court to find that the parents consciously had disregarded a risk to their child when they failed to properly feed him, and they were found to have acted recklessly. Id.

922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979). The difference in the present case, however, is that it was the mother who inflicted the injuries, and someone other than an adoptive or biological parent who failed to protect the infant.

Finally, I want to reiterate that imposing criminal liability for omissions is not tantamount to creating a common-law crime. Although we no longer have common-law crimes, we have preserved "the common law rules of criminal law not in conflict with [our Penal Code]. . . . The rule applicable to omissions does not define a substantive crime. Failure to act when there is a special relationship does not, by itself, constitute a crime. The failure must expose the dependent person to some proscribed result. The definition of proscribed results constitutes the substantive crime, and it is defined in the criminal code." (Internal quotation marks omitted.) *State* v. *Williquette*, 129 Wis. 2d 239, 253–54, 385 N.W.2d 145 (1986). The rule regarding omissions, therefore, is not inconsistent with § 53a-59 (a) (3). To constitute the cause of the harm, it is not necessary that the defendant's act be the sole reason for the realization of the harm that has been sustained by the victim. The defendant does not cease to be responsible for his otherwise criminal conduct because there were other conditions that contributed to the same result. As we pointed out previously, the mother's violent actions were of such a nature as to put any ordinary, reasonable person on notice that the child's life truly and realistically was in immediate peril. The defendant easily could, and should, have removed the child from this danger. His failure to do so, under the circumstances previously described, is sufficient to support a finding by the trial judge that his failure to act was a contributing cause of the child's unfortunate injuries.

Therefore, at the risk of repeating myself, I would not adopt a broad general rule covering other circum-

stances, but, rather, I would conclude only that, "in accordance with the trial court findings, when the defendant, who considered himself the victim's parent, established a familial relationship with the victim's mother and her children and assumed the role of a father, he assumed, under the common law, the same legal duty to protect the victim from the abuse as if he were, in fact, the victim's guardian. Under these circumstances, to require the defendant as a matter of law to take affirmative action to prevent harm to the victim or be criminally responsible imposes a reasonable duty. That duty does not depend on an ability to regulate the mother's discipline of the victim or on the defendant having exclusive control of the victim when the injuries occurred. Nor is the duty contingent upon an ability by the state or the mother to look to the defendant for child support. [See *W.* v. *W.*, 248 Conn. 487, 504–505, 728 A.2d 1076 (1999) (concluding that man who was not biological father, but who consistently had treated child as his daughter, was estopped from denying paternity for purposes of child support)]. Moreover, whether the defendant had created a total in loco parentis relationship with the victim by January, 1993, is not dispositive of whether the defendant had assumed a responsibility for the victim. *Leet* v. *State*, [595 So. 2d 959, 962 (Fla. App. 1991)]. If immediate or emergency medical attention is required from a child's custodian it should not matter that such custodian is not the primary care provider or for that matter a legally designated surrogate." (Internal quotation marks omitted.) *Miranda I*, supra, 245 Conn. 226–27.

Finally, I disagree with my colleagues that the continuing demographic trend, which we first noted in *Miranda I*, supra, 245 Conn. 228, that reflects a significant increase in nontraditional alternative family arrangements; United States Bureau of the Census, Marital Status and Living Arrangements: March 1984, Cur-

rent Population Reports, Series p-20, No. 399 (1985); counsels against the imposition of liability in this case. I do not agree that persons inclined to enter relationships that involve children will consciously decide against such involvement for fear of being held responsible if and when a child is abused or neglected. Because more and more children will be living with or may depend upon adults who do not qualify as a natural or adoptive parent, the fact that we are, at best, affording protection only to those children whose adult caregivers have chosen to have their relationships officially recognized hardly advances the public policy of protecting children from abuse.

Accordingly, I respectfully dissent.